ALLEGHENY ENERGY SUPPLY COMPANY, LLC and Monongahela Power Company, Appellees/Cross–Appellants

v.

WOLF RUN MINING COMPANY, f/k/a Anker West Virginia Mining Company, Inc., Hunter Ridge Holdings, Inc., f/k/a Anker Coal Group, Inc., and International Coal Group, Inc.

Appeal of Wolf Run Mining Company and Hunter Ridge Holdings, Inc. Appellants/Cross–Appellees.

Superior Court of Pennsylvania.

Argued May 16, 2012.
Filed Aug. 13, 2012.
Reargument Denied Oct. 18, 2012.

Jeff A. Woods, Lexington, KY, for Hunter Ridge Holdings, Inc.

Russell J. Ober, Jr., Pittsburgh, for Allegheny Energy Supply Company.

BEFORE: MUSMANNO, BENDER, and STRASSBURGER,* JJ.

OPINION BY STRASSBURGER, J.

This consolidated appeal and cross appeal stem from a judgment entered in favor of Appellees/Cross–Appellants, Allegheny Energy Supply Company, LLC and Monongahela Power Company (collectively referred to as "Allegheny Energy") and against Appellants/Cross–Appellees Wolf Run Mining Company and Hunter Ridge Holdings, Inc.[1] (collectively referred to as "Wolf Run"). We affirm in part, vacate in part, and remand for further proceedings.

On February 17, 2005, Allegheny Energy entered into a Coal Sales Agreement (the Agreement)[2] with Wolf Run, then

---

* Retired Senior Judge assigned to the Superior Court.

1. On May 12, 2010, the trial court dismissed all claims raised against Appellee International Coal Group. *See* Order, 5/12/2010.

2. Prior to the execution of the Agreement, Allegheny Energy entered into a separate contract with Wolf Run for delivery of coal from Wolf Run's Sycamore No. 1 Mine. Wolf Run closed its Sycamore No. 1 Mine before the required tonnage under that contract was delivered. To account for this shortfall, Section

known as Anker West Virginia Mining Company, whereby Allegheny Energy agreed to purchase all coal from existing reserves of the Sycamore No. 2 Mine. Anker Coal Group, Inc., the parent company of Anker West Virginia, guaranteed Anker West Virginia's performance of the Agreement.[3]

At the time the parties entered into the Agreement, the existing reserve of the Sycamore No. 2 Mine was estimated to contain not less than 20 million tons of coal. The Agreement provided that throughout 2005 until September of 2006, Wolf Run would deliver to Allegheny Energy the actual production of the Sycamore No. 2 Mine, which was estimated at 500,000 tons. Beginning on October 1, 2006, Wolf Run would deliver 150,000 tons per month. Beginning in January 2007 through the expiration of the Agreement, Wolf Run would deliver 1.8 million tons of coal per year until the reserve was exhausted. The Agreement also contained a *force majeure* clause which excused non-delivery when certain events occurred.

During the summer of 2006, operations at the Sycamore No. 2 Mine were temporarily idled. Wolf Run attributed the closing to the accidental breach of an abandoned gas well, changes in the enforcement of regulations for mining within the vicinity of gas wells, and a collapsing mine roof. As a result, in August of 2006,

Wolf Run informed Allegheny Energy that it would be unable to meet its obligations under the Agreement. On August 25, 2006, Wolf Run issued a formal *force majeure* notice pursuant to Section 13 of the Agreement wherein it averred that the conditions leading to the idling of the Sycamore No. 2 Mine were beyond its control, and not the result of its fault or negligence.[4] To cover the delivery shortfalls Allegheny Energy purchased coal from third party suppliers.

On December 18, 2006, Allegheny Energy instituted a breach of contract action against Wolf Run, Hunter Ridge, and ICG based on Wolf Run's failure to perform under the Agreement.[5] Wolf Run filed a counterclaim.

On May 11, 2010, following pre-trial discovery and motions, the Honorable R. Stanton Wettick granted summary judgment in favor of ICG with respect to all claims asserted against it. Additionally, Judge Wettick granted summary judgment in favor of Allegheny Energy with respect to Wolf Run's counter claim.

The matter proceeded to a lengthy non-jury trial before the Honorable Joseph M. James. That trial began on January 10, 2011 and concluded on February 1, 2011. On May 3, 2011, the trial court issued a Memorandum and Verdict in which it found that Wolf Run had breached the Agreement; that the *force majeure* clause

1.3 of the February 17, 2005 Agreement specified that the delivery shortfalls from the Sycamore No. 1 Mine would be covered by coal from the Sycamore No. 2 Mine at the prices that had been previously established for the Sycamore No. 1 Mine.

3. In March of 2006, shortly after the parties entered into the Agreement, Anker Coal was acquired by, and consolidated into, International Coal Group (ICG). Following the consolidation, Anker West Virginia changed its name to Wolf Run and Anker Coal changed its name to Hunter Ridge. Under the terms

of the acquisition, Wolf Run remained a subsidiary of Hunter Ridge, while Hunter Ridge became a subsidiary of ICG.

4. In September of 2007, the Sycamore No. 2 Mine was reopened, and deliveries of coal to Allegheny Energy resumed, but production fell below the tonnage required under the Agreement.

5. This case ultimately proceeded on the basis of Allegheny Energy's second amended complaint.

contained in the Agreement did not excuse Wolf Run's breach; that the defense of commercial impracticability under Section 2–615 of the Uniform Commercial Code (U.C.C.) was unavailable to Wolf Run; and that Allegheny Energy was entitled to damages as a result of Wolf Run's breach of contract. *See* Memorandum and Verdict, 5/3/2011, at 5. The trial court awarded damages to Allegheny Energy in the total amount of $104,103,893.00. *Id.* at 6–7. This award included $11,304,332.00 in past damages and prejudgment interest for breaches related to the Sycamore No. 2 Mine, $2,456,533.00 in past damages and prejudgment interest for breaches related to the Sycamore No. 1 Mine, and $90,343,-02.00 in future damages. *Id.* at 7.

Both parties filed timely motions for post-trial relief, which were denied in their entirety on August 25, 2011. On that same date, judgment was entered against Wolf Run and in favor of Allegheny Energy in the amount of $106,071,884.40, which included the amount of the verdict plus interest accrued from May 2, 2011 until August 25, 2011. Both parties now appeal to this Court.[6]

Allegheny Energy raises the following issues for our review:

1. [Because] the uncontroverted evidence at trial established that Allegheny Energy spent $84,163,895 to purchase cover coal because of [Wolf Run's] failure to deliver the quantities of coal required in [the Agreement] and the trial court expressly found that Allegheny Energy acted reasonably in doing so, did the trial court err by limiting the damages awarded to Allegheny Energy for cover coal to $11,304,332.00?

2. Did the trial court err in granting summary judgment to [ICG], where Al-

legheny Energy established genuine issues of material fact regarding: whether ICG was the *alter ego* of Wolf Run or Hunter Ridge, which contracted to supply coal to Allegheny Energy; whether ICG assumed the obligations of Wolf Run and Hunter Ridge under the agreement at issue; and whether ICG materially participated in, and in fact directed, Wolf Run's and Hunter Ridge's breaches of contract?

Allegheny Energy's Brief at 6.

Wolf Run's brief sets forth a counterstatement of questions involved, responding to Allegheny Energy's questions presented, and asserts its own issues on cross-appeal:

1. Did the trial court err in its legal application of the contractual *force majeure* standard by focusing on the foreseeability of conditions despite the parties' agreement that *force majeure* may apply to "existing" or "forseen" conditions, and by determining negligence based on a standard of "aggressiveness" instead of "reasonableness"?

2. Did the trial court err in its calculation of future damages (a) by measuring damages as of the time of trial instead of the time [Allegheny Energy] learned of the breach years before trial, based on both overwhelming evidence and [Allegheny Energy's] own admissions; (b) by making a finding regarding the amount of coal remaining in the reserve that is not supported by competent evidence; and (c) by failing to reduce future damages to present value?

3. Did the trial court err by sustaining an objection to Wolf Run's effort to cross-examine [Allegheny Energy's] lead witness concerning key admissions made

6. The trial court did not require the parties to file concise statements pursuant to Pa.R.A.P. 1925(b) and none was filed.

by [Allegheny Energy] in a brief filed by [Allegheny Energy's] counsel?

4. Did the trial court err by awarding prejudgment interest on the damages arising out of Section 1.3 of the Coal Sales Agreement, where the Section 1.3 pricing had not become due by agreement of the parties?

Wolf Run's Brief at 3.

We begin our evaluation of this case by addressing Allegheny Energy's claim that Judge Wettick erred in granting summary judgment as to ICG. Allegheny Energy's Brief at 36.

Our standard of review on an appeal from the grant of a motion for summary judgment is well-settled. A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*ADP, Inc. v. Morrow Motors Inc.*, 969 A.2d 1244, 1246 (Pa.Super.2009) (citation omitted).

■■■ First, Allegheny Energy asserts that it raised a genuine issue of material fact that Wolf Run was an alter ego of ICG, thus permitting it to pierce the corporate veil to enforce judgments against Wolf Run.[7] Allegheny Energy's Brief at 36–37. Judge Wettick disagreed and offered the following rationale:

[t]he evidence most favorable to Allegheny Energy will support a finding that after Anker Coal and ICG entered into the March 31, 2005 Business Combination Agreement, ICG took over the management of Anker West Virginia's operations of Sycamore Mine No. 2. It exercised absolute control over its operations, including operational and finan-

7. Piercing the corporate veil is a "means of assessing liability for the acts of a corporation against an equity holder in the corporation." *Village at Camelback Property Owners Assn. Inc. v. Carr*, 371 Pa.Super. 452, 538 A.2d 528, 532 (1988), *affirmed without opinion at* 524 Pa. 330, 572 A.2d 1 (1990). The party seeking to establish personal liability through piercing the corporate veil must show the person "in control of a corporation [used] that control, or [used] the corporate assets, to further his ... own personal interests...." *Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637, 641 (1978). Pennsylvania law has a strong presumption against piercing the corporate veil. *Lumax Industries, Inc. v. Aultman*, 543 Pa. 38, 669 A.2d 893, 895 (1995). Any inquiry involving corporate veil-piercing must "start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." *Wedner v. Unemployment Compensation Bd. of Review*, 449 Pa. 460, 296 A.2d 792, 794 (1972). One "exception" is the alter ego theory which requires proof (1) that the party exercised domination and control over corporation; and (2) that injustice will result if corporate fiction is maintained despite unity of interests between corporation and its principal. *See Ashley, supra.*

cial decisions. It made the decision to close Sycamore Mine No. 2 in June 2006 and to invoke the *force majeure* provisions of the Coal Sales Agreement in August 2006. It also made decisions involving the resumption of production in September 2007, the levels of production, and the sealing of portions of the mine.

However, Allegheny Energy has not offered evidence, as to either Anker West Virginia or Anker Coal, of a failure to observe corporate formalities, undercapitalization, an absence of corporate records, or siphoning of funds from either corporation to ICG or other corporate entities which ICG directly or indirectly controls.

Also, Allegheny Energy has not offered any evidence that would support a finding that the corporate structures are being used to create fraud or to work injustice. The entity with which Allegheny Energy contracted (Anker West Virginia) continues to operate. While decisions concerning its operations are now made by ICG, Allegheny Energy has not offered any evidence that ICG's decisions have been contrary to the interests of Anker West Virginia or that ICG or other companies that it controls have siphoned off assets of Anker West Virginia. This is equally true for Anker Coal.

\* \* \*

When it contracted with Anker West Virginia and obtained a guarantee from Anker Coal, Allegheny Energy knew that it could look only to the assets of these corporations in the event that Anker West Virginia breached the contract. There is no evidence of any abuse of the privilege of incorporation.

\* \* \*

■ [Thus,] in the present case, Allegheny Energy has not produced evidence that could support either a finding that corporate formalities have not been observed or a finding that a piercing of the corporate veil is required to prevent fraud or other wrongdoing.

Memorandum and Order, 5/11/2010, at 23–24 28–29. We agree with Judge Wettick's well-reasoned analysis. Although there is evidence of corporate control, the record is devoid of evidence of self-dealing by ICG as the parent corporation or evidence that Wolf Run, as subsidiary, functioned as a shell corporation to assume liability without sufficient assets or capital.

Allegheny Energy also claims that a genuine issue of material fact exists that would show ICG implicitly agreed to assume the obligations of Wolf Run based on statements made by ICG's interim president. Allegheny Energy's Brief at 50–52. Judge Wettick rejected this claim, stating:

Allegheny Energy seeks to enforce a statement allegedly made by Mr. George R. Desko (then interim President of ICG) at a November 2004 meeting that ICG and Anker Coal were on track to be a merged company; the plan was to move Anker Coal into ICG; and this meant that Allegheny Energy could count on a reliable source of coal in the future because this would be a larger company.

\* \* \*

■ On March 31, 2005, Anker Coal and ICG entered into a Business Combination Agreement; the transaction closed on November 18, 2005. At a June 1, 2005 meeting, ICG represented that after the merger Allegheny Energy will be dealing with a stronger and more capable supplier. However, Anker Coal was never merged into ICG; instead, it became an indirect subsidiary.

Even assuming that ICG's statements made after February 17, 2005 could be interpreted as a promise that ICG and Anker Coal will merge, this promise cannot be enforced because of the absence of any consideration.

Allegheny Energy also relies on provisions of the Guarantee that Anker Coal guarantees performance by Anker West Virginia and its successors and assigns and that the Guarantee shall bind Anker Coal and its successors and assigns. This provision does not impose any obligations on ICG because it is not a successor or assignee. To the contrary, Anker West Virginia and Anker Coal continue to exist.

Memorandum and Order, 5/11/2010, at 22 (internal citations omitted). Again, we agree.

■■■■ Finally, Allegheny Energy asserts that it has presented a genuine issue of material fact that ICG is liable for Wolf Run's breach of the Agreement under a participation theory. Allegheny Energy's Brief at 47–48. Contrary to Allegheny Energy's argument, the participant theory imposes liability on a corporation when a shareholder participates in tortious activities. *See Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 470 A.2d 86, 90 (1983) ("Under the participation theory . . . liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity."). Accordingly, this theo-

ry of liability is inapplicable to the instant breach of contract case.

Thus, as Allegheny Energy has failed to meet its threshold burden under the summary judgment rule to present a genuine issue of material fact regarding the relationship between Wolf Run and ICG which would permit ICG to be held liable for Wolf Run's non-performance, we affirm Judge Wettick's grant of summary judgment as to all claims against ICG.[8]

■■■■ With respect to the parties' claims regarding the decisions made by the trial judge, Judge James, we note that the relevant standard of review following a non-jury trial is as follows:

Our appellate role in cases arising from nonjury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial "are not binding on an appellate court

---

8. As Judge Wettick noted, even if Allegheny Energy had sustained its burden and made it past summary judgment as to ICG, various defenses would have barred its recovery at trial. However, contrary to Allegheny Energy's assertion, the viability of ICG's defenses at trial did not form the basis for the grant of summary judgment in ICG's favor. Allegheny Energy's Brief at 49–50. The record makes clear that Judge Wettick granted ICG's motion for summary judgment because ICG was not successor in interest, alter ego, nor an assign of Wolf Run. Thus, any discussion of possible defenses is irrelevant to Judge Wettick's conclusion that Allegheny Energy did not proffer sufficient evidence that a material issue of genuine fact existed to pierce the corporate veil.

because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts" of the case. *Wyatt Inc. v. Citizens Bank of Pennsylvania*, 976 A.2d 557, 564 (Pa.Super.2009) (citations omitted).

We now consider Wolf Run's first issue on cross-appeal—whether the trial court erred in its legal application of the *force majeure*[9] clause contained in the Agreement. The clause at issue provides as follows,

### 13.0 *FORCE MAJEURE*

13.1 As used herein, *"force majeure"* means any causes or circumstances beyond the reasonable control and without fault or negligence of the party affected thereby or of its subcontractors or carriers, such as, acts of God, governmental regulation, war, acts of terrorism, weather, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of carrier's equipment, accidents of navigation, interruptions to transportation, embargoes, order of civil or military authority, or other causes, whether of the same or different nature, existing or future, foreseen or unforeseeable, which wholly or partly prevent the mining, processing, shipment and/or loading of the coal by Seller, or the receiving, transporting and/or delivery of the coal by any carrier, or the accepting, utilizing and/or unloading of the coal by Buyer, but specifically excluding economic factors alone.

Instantly, the trial court determined that the *force majeure* clause did not excuse Wolf Run's performance under the Agreement and reasoned as follows:

[Wolf Run] officially notified Allegheny Energy of the existence of *force maj-*

*eure* conditions in a letter dated August 25, 2006. This letter listed three conditions that created the *force majeure* circumstances. They were: (1) Roof conditions; (2) the presence of an abundance of gas wells; and (3) a change in the enforcement of regulations relating to mining in the vicinity of gas wells. In order to evaluate the claims of the August 25, 2006 letter, it is necessary to examine the events that took place between early 2005 and August 25, 2006.

The evidence establishes that [Wolf Run was] apprised of the severity of the gas well problem even before [it] entered into the February 17, 2005 contract. The memos sent by Gary M. Hartsog, of Alpha Engineering (a consultant hired by Anker) on January 24, 2005 and revised and re-sent on April 18, 2005 clearly list the large number of abandoned gas wells in the reserve and the difficulty in finding them. There was some speculation that the recipient of the January 24, 2005 memo (Dick Beauchamp of Anker) may not have received the memo. This was rebutted by the testimony that spelled out the means of delivery and a response by Beauchamp to the January 24, 2005 memo. Clearly [Wolf Run was] on notice of the severity of the problem and took less than aggressive action to solve the problem.

The fact that later well searches were highly successful indicates that the gas well problem was not beyond [Wolf Run's] reasonable control and that the serious problem occurred because of [Wolf Run's] fault or negligence. The issue of roof conditions also fails as a *force majeure* condition. Evidence clearly establishes that the failed roof

---

**9.** A *force majeure* clause lists a series of events such as earthquakes, storms, floods, natural disasters, wars, or other "acts of God" which the parties to a contract have agreed upon as excuses for nonperformance. Murray on Contracts 639 (1990).

conditions were caused by poor mining equipment. Inexperienced miners using unsuitable equipment contributed to the roof failures. The inconsistency of the Pittsburgh Seam of coal was also a known factor. Again, the fact that mining subsequent to the August 25, 2006 notice was successful and absent roof problems supports this finding. [Wolf Run] hired Dave Maynard to operate the mine when it reopened in 2007. The roof conditions, once offered as a *force majeure* condition, have been resolved by better mining practices.

Finally, [Wolf Run's] letter of August 25, 2006 lists a change in enforcement regulations relating to mining in the vicinity of gas wells. There is no evidence of any regulatory change with regard to mining near gas wells. Evidence indicates that [the Mine Safety and Health Administration (MSHA)] always required documentation of how searches for gas wells were conducted. Nothing in this record indicates any change from that position from the time of the Hartsog Memos (January–April 2005) until the *force majeure* letter of August 25, 2006). [Wolf Run was] apprised of the gas well problem and the regulatory climate long before the gas well was breached in June of 2006.

Memorandum and Verdict, 5/3/2011, at 3–4 (italics added).

Wolf Run argues that the trial court (1) inappropriately focused its decision on the foreseeability of the conditions when the clause specifically notes that a *force majeure* condition may be foreseen, and (2) evaluated Wolf Run's actions regarding nonperformance under an "aggressive ac-

tion" standard and not a reasonable action standard as called for by the terms of the Agreement. Wolf Run's Brief at 19. We disagree.

■ Despite Wolf Run's argument to the contrary, the trial court rejected the *force majeure* defense not on the basis of foreseeability, but because it found that that the conditions leading to the breach of the Agreement were not beyond the reasonable control of Wolf Run and occurred due to Wolf Run's fault or negligence concerning the maintenance and operation of the Sycamore No. 2 Mine.[10] Thus, we conclude that the trial court did not err in determining that Wolf Run's underperformance was not excused by the terms of the *force majeure* clause.

We turn now to the various complaints regarding the trial court's calculation of damages. Because the Agreement is a contract for the sale of goods, the law applicable to the contract is Article 2 of the Uniform Commercial Code (U.C.C.), which has been adopted in both Pennsylvania and West Virginia. *See* 13 Pa.C.S. § 2101 *et seq.;* W.Va.Code § 46–2–713. For ease of reference, we will refer to the applicable U.C.C. section number in addressing claims under these statutes.

First, Allegheny Energy contends that the trial court erred in awarding only $11,304,332 in past damages with regard to the Sycamore No. 2 Mine. *Id.* at 28. Instead, Allegheny Energy argues that it should have been awarded the total expenditures necessary to purchase the cover coal, which it claims amounted to nearly $84.2 million.

---

**10.** Wolf Run seizes on the trial court's language that Wolf Run took "less than aggressive action" to solve the gas well problem and asserts that the trial court applied the wrong standard. Actually, the language is merely an elaboration of why the claimed *force majeure* conditions were not beyond Wolf Run's reasonable control and why Wolf Run was negligent in failing to correct those conditions.

The trial court heard testimony from two experts in this case regarding the computation of past damages. Brian DiLucente (DiLucente) testified on behalf of Allegheny Energy. His testimony is summarized as follows:

To calculate the price that Allegheny Energy paid to cover [Wolf Run's] breaches, the first step was to identify potential replacement purchases. The contracts considered as potential replacement purchases were contracts for coal to be delivered to the Harrison Station [the power station supported by the coal from Sycamore No. 2 Mine] that were entered into after August 25, 2006, the date that Allegheny was advised that the mine was idled, and contracts for the delivery of coal to other Allegheny Energy power stations that had tonnage diverted to the Harrison Station after August 25, 2006.

Once the replacement purchases were identified, a weighted average price for the coal was calculated. The weighted average represents the price per ton that Allegheny Energy paid for cover coal. The weighted average price was then compared to the price [Allegheny Energy] would have paid to [Wolf Run] for coal under the Coal Sales Agreement if [Wolf Run] had complied with [its] delivery obligations. The price established for the purchase of coal in the Coal Sales Agreement was then subtracted from the average replacement coal price; the difference is what Allegheny Energy actually spent to cover [Wolf Run's] breaches of the Coal Sales Agreement. The result of these calculations shows that as of December 31, 2010, Allegheny Energy spent $84,163,895 to purchase replacement coal to remedy the shortfall that was created by [Wolf Run's] failure to deliver the promised quantities of coal.

Allegheny Energy's Brief at 30–31 (citations to the record and notes of testimony omitted).

The trial court was also presented with a series of damages projections created by Wolf Run's expert witness Kevin Cardwell (Cardwell). Each of Cardwell's pricing scenarios calculated damages using actual published market prices taken from contracts entered into by Allegheny Energy between August and December of 2006. See Wolf Run's Trial Exhibit 260(a)-(o ).

The trial court determined that $11,304,332 in past damages was proper. This amount corresponds to a past damages calculation contained within Cardwell's pricing scenarios. See Wolf Run's Trial Exhibit 260(e) (Scenario # 2 (15.409 MMT)—Inflated Market Price Method).

The determination of damages is a factual question to be decided by the fact-finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses. Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

*Omicron Systems, Inc. v. Weiner,* 860 A.2d 554, 564–565 (Pa.Super.2004), quoting *Judge Technical Services, Inc. v. Clancy,* 813 A.2d 879, 885 (Pa.Super.2002).

[An award of damages] should not be interfered with unless it clearly appears that the amount awarded resulted from partiality, caprice, prejudice, corruption or some other improper influence. Generally, a verdict will not be disturbed merely on account of the smallness of

the damages awarded or because the reviewing court would have awarded more.

*Cooley v. Jefferson Bank,* 355 Pa.Super. 1, 512 A.2d 713, 714 (1986) (citations omitted).

 Instantly, the trial court rejected Allegheny Energy's calculations and ordered past damages and prejudgment interest in the amount of $11,304,332, a calculation presented to the court by Cardwell which inflated actual market prices 2.5% each year through 2010. Because the trial court's determination was based on competent evidence presented at trial, and because the trial court, as fact finder, was free to believe all, part of none of the evidence presented, we see no reason to disturb the trial court's award of past damages.[11]

We now consider Wolf Run's challenge to the trial court's award of future damages. The trial court awarded Allegheny Energy $90,341,028 in future damages, reasoning that Wolf Run's repudiation of the Agreement occurred at the time of trial. In its Memorandum and Verdict, the trial court stated:

[b]ecause of the ambiguity of [Wolf Run's] intention to perform under the Agreement, [Allegheny Energy was] justified in not covering the future shortfalls in 2006. However, **at the time of trial,** it was obvious that [Wolf Run] would never produce 1,800,000 tons of coal per year from Sycamore 2. Therefore, it is reasonable to use the

price of coal at the time of trial, $53 per ton [to calculate future damages].

Memorandum and Verdict 5/3/2011, at 7 (emphasis added).

Wolf Run argues that the trial court erred in setting the date of its repudiation as the day of trial when the evidence showed Allegheny Energy was unequivocally aware of the repudiation in 2006. Wolf Run's Brief at 29. We agree.

 The U.C.C. specifies that "the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price." U.C.C. § 2–713. "If an action based on anticipatory repudiation comes to trial before the time for performance with respect to some or all of the goods, any damages based on market price [under Section 2–713] shall be determined according to the price of such goods prevailing at the time when the aggrieved party **learned of the repudiation.**" U.C.C. § 2–723 (emphasis added).

In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform. Mere expression of doubt as to his willingness or ability to perform is not enough to constitute a repudiation, although such an expression may give an obligee reasonable grounds to believe that the obligor will commit a serious breach and may ultimately result in a

---

**11.** In its cross-appeal, Wolf Run argues that the calculations of DiLucente are flawed because Allegheny Energy did not specifically identify the cover coal contracts that were made as a result of Wolf Run's breach, but instead instructed DiLucente to exclude timely low-priced contracts that would have significantly reduced Allegheny's past damages. Wolf Run's Brief at 54, 56. In other words, Allegheny Energy cherry-picked the contracts it relied upon in its damages calculation. Thus, Wolf Run contends that the trial court's rejection of Allegheny Energy's proposed damages calculation was proper. Consistent with our holding, we find the trial court's deference to the calculations offered by Wolf Run reasonable, particularly in light of Allegheny Energy's "creative" accounting methodology.

repudiation.... However, language that under a fair reading "amounts to a statement of intention not to perform except on conditions which go beyond the contract" constitutes a repudiation. *Oak Ridge Const. Co. v. Tolley,* 351 Pa.Super. 32, 504 A.2d 1343, 1346–1347 (1985); U.C.C. § 2–610.

■ Allegheny Energy was first informed of a possible breach of the Agreement in August of 2006. While the full scope of the repudiation may not have been readily apparent at this time, by August 16, 2006, Allegheny Energy knew for certain (1) that the Agreement was premised on the Sycamore No. 2 Mine operating at capacity with four active sections, and (2) that for the foreseeable future, the Sycamore No. 2 Mine would operate as a single-section mine with a projected output of 480,000 tons annually.[12] This information was communicated directly to Allegheny Energy by Wolf Run. Additionally, Wolf Run's issuance of a formal *force majeure* notice pursuant to Section 13 of the Agreement on August 25, 2006, unequivocally placed Allegheny Energy on notice of the fact that Wolf Run's future performance was compromised. These uncontroverted facts dictate a conclusion that Allegheny Energy learned of Wolf Run's repudiation in August of 2006. Accordingly, we vacate the portion of the verdict that calculated future damages as of the time of trial and remand for further proceedings. In light of this result, we need not consider Wolf Run's challenge to the trial court's finding regarding the amount of coal remaining in the reserve of Sycamore No. 2 Mine, its argument that the trial court erred in its failure to reduce future damages to present value, nor

its challenge to the admissibility of admissions contained within Allegheny Energy's pre-trial briefs. Wolf Run Brief at 44–47, 41–42.

Finally, we consider the trial court's award of prejudgment interest. Wolf Run challenges the trial court's award of prejudgment interest on the portion of damages concerning the Sycamore No. 1 Mine. Wolf Run's Brief at 47–49. In its verdict, the trial court awarded Allegheny Energy $2,456,533 in past damages and prejudgment interest related to Wolf Run's breach of Section 1.3 of the Agreement. Wolf Run argues that the trial court erred in ordering prejudgment interest on this amount because the parties had agreed in January of 2008 to table any issues related to the Sycamore No. 1 Mine until the condition of the Sycamore No. 2 Mine improved, and thus, payment under Section 1.3 was not due. Wolf Run's Brief at 47–49.

■ "Our review of an award of pre-judgment interest is for abuse of discretion." *Kaiser v. Old Republic Ins. Co.,* 741 A.2d 748, 755 (Pa.Super.1999) (citation omitted). "In contract cases, statutory prejudgment interest is awardable as of right." *Pittsburgh Construction Company v. Griffith,* 834 A.2d 572, 590 (Pa.Super.2003) (citation omitted). Prejudgment interest is recoverable from the time of performance on the amount due. *Kessler v. Old Guard Mut. Ins. Co.,* 391 Pa.Super. 175, 570 A.2d 569, 573 (1990); Restatement (Second) of Contracts § 354(1).

■ The evidence presented at trial established that in January of 2008, Allegheny Energy invoked the terms of Sec-

---

**12.** Wolf Run indicated in communications from August 9, 2006, that, at best, the Sycamore No. 2 Mine would have two operational sections, resulting in a production shortage of 800,000 to 1,300,000 tons annually after

2006. In fact, in a brief on discovery issues, Allegheny Energy told the trial court Wolf Run's August 9, 2006 letter stated unequivocally that Wolf Run would not fulfill its obligations under the Agreement.

tion 1.3 and requested Wolf Run deliver the Sycamore No. 1 Mine shortfall from the Sycamore No. 2 Mine. Wolf Run failed to do so, claiming that the parties agreed to table issues relating to the Sycamore No. 1 Mine until the Sycamore No. 2 Mine was producing more coal. Wolf Run's Brief at 47. Wolf Run argues that this informal tabling of issues related to Section 1.3 supersedes Section 1.3 itself. The trial court disagreed, stating:

> [Allegheny Energy's] damages can be divided into the following categories ... past damages under § 1.3[and] prejudgment interest under § 1.3 ... The [Agreement] called for any shortfall from the Sycamore 1 agreement was to be delivered from the Sycamore 2 mine at Sycamore 1 prices. This shortfall was set at 296,197 tons. [Allegheny Energy was] billed at the Sycamore 2 rates for this tonnage and suffered damages [beginning in January of 2008] in the amount of $2,046,737.

Memorandum and Verdict 5/3/2011, at 6. Using the statutory rate of 6%, the trial court awarded prejudgment interest in the amount of $409,796. We discern no abuse of discretion in the trial court's determination and, accordingly, will not disturb the award of prejudgment interest.

In sum, we affirm Judge Wettick's grant of summary judgment as to the claims against ICG. We also affirm the judgment entered after trial insofar as it recognized that the *force majeure* clause did not provide a defense to Wolf Run. With respect to the various questions concerning damages, we affirm the trial court's award of $11 million in past damages for Wolf Run's breach of the Agreement related to the Sycamore No. 2 Mine and the trial court's award of prejudgment interest with regard to Wolf Run's breach of the Agreement related to the Sycamore No. 1 Mine. We vacate the award of future damages and remand this matter to the trial court with instructions to recalculate its award of future damages using the market price of coal when Allegheny Energy learned of Wolf Run's repudiation in August of 2006.

Judgment affirmed in part, vacated in part, and remanded for further proceedings. Jurisdiction relinquished.