J-A07011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| MATTHEW SALTZER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID ROLKA AND ROBERT LOUBE | : | |
| | : | |
| Appellant | : | No. 702 MDA 2017 |

Appeal from the Judgment Entered May 23, 2017
In the Court of Common Pleas of Cumberland County
Civil Division at No(s): 2014-6195

| MATTHEW SALTZER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID ROLKA AND ROBERT LOUBE | : | No. 750 MDA 2017 |

Appeal from the Judgment Entered May 23, 2017
In the Court of Common Pleas of Cumberland County
Civil Division at No(s): 2014-6195

BEFORE:   PANELLA, J., OLSON, J., and STEVENS[*], P.J.E.

MEMORANDUM BY PANELLA, J.:                    **FILED OCTOBER 30, 2018**

David Rolka, Robert Loube, Ph.D., and Matthew Saltzer were the only

members of a closely held limited liability company ("LLC"), Rolka Loube

Saltzer Associates, LLC ("RLSA"). After the company terminated Saltzer's

_____

[*] Former Justice specially assigned to the Superior Court.

employment, Rolka and Dr. Loube amended the company's operating agreement to provide a formula for the buyout of a retired member's share. They then "purchased" Saltzer's 20% membership share for the formula price of $63,389 without Saltzer's consent.

Saltzer filed suit, asserting he was not fairly compensated for his membership share. After a bench trial, the court valued Saltzer's membership share at $294,000, but denied Saltzer's claim for punitive damages. Rolka and Dr. Loube appeal from the court's valuation of Saltzer's membership share. Saltzer cross-appeals from the court's denial of punitive damages and attorney's fees, and from its application of a 24% risk-based discount to the value of his membership interest.[1] We affirm.

We review a nonjury trial verdict in the same manner we review a jury verdict. We assess the court's findings of fact to determine if the record contains competent evidence sufficient to support them. *See Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co*., 53 A.3d 53, 60 (Pa. Super. 2012). The court is free to believe "all, part or none of the evidence presented." *Ruthrauff, Inc. v. Ravin, Inc.*, 914 A.2d 880, 888 (Pa. Super. 2006) (citation omitted). We are not permitted to re-weigh the evidence or second-guess the trial court's credibility determinations. *See id*.

---

[1] All parties filed their appeals prematurely. However, judgment was subsequently entered on the verdict, and we have jurisdiction to entertain this appeal. *See Mount Olivet Tabernacle Church v. Edwin L. Wiegand Division,* 781 A.2d 1263, 1266 n.3 (Pa. Super. 2001).

- 2 -

We review the evidence in the light most favorable to the verdict winner. *See Allegheny Energy Supply Co., LLC*, 53 A.3d at 60. We will reverse the trial court only when the evidence cannot support its findings or if it has committed a controlling error of law. *See id*., at 60-61.

The trial court summarizes its factual findings:

[RLSA] is a Pennsylvania limited liability company. … Its primary business activity is to provide consulting services to state public utility commissions and the Federal Government. It administers billing and collection subsidy programs, and collects and processes data related to the programs.

From its inception, [RLSA] was owned by David Rolka, Robert Loube, and Matthew Saltzer. They had done similar work for a previous employer. They left that employer to form [RLSA]. Their employer wished them well and sold [RLSA] the hard assets that they had been using. In addition, each member brought the value of his own skills and best efforts into [RLSA].

On [approximately] April 2, 2007, the parties executed an Operating Agreement creating one-thousand (1,000) ownership units. The agreement further provided that Rolka and Loube would each own four-hundred (400) units and that Saltzer would own two-hundred (200) units.

From the outset, all three members were employed by [RLSA]. Rolka acted as [RLSA's] President and executed administrative duties. Loube worked primarily on the consulting side of the business. Saltzer was employed as a specialist in information technology and held the title of Vice President of Operations. Each member received regular compensation while employed with [RLSA]. They also received periodic disbursements of [RLSA's] profits in proportion to their forty/forty/twenty (40/40/20) ownership interests.

The April 2, 2007 Operating Agreement did not include any provision to address member separation by death or otherwise. Over the years, the parties talked about amending the agreement to provide for a buyout provision. However, they never got around

- 3 -

to doing it. In May of 2013, [RLSA] purchased life insurance on all three members naming [RLSA] as the beneficiary. The proceeds were to be used to buy the share of a deceased member. However, no formal agreement was ever reached.

Saltzer was fired as an employee on May 9, 2013, the same day that the members purchased the life insurance policies. Nevertheless, as an owner, he continued to share in [RLSA's] profits.

On June 26, 2014, over Saltzer's objection, [Rolka and Dr. Loube] purported to amend the Operating Agreement to grant them the right to force a buyout of his minority interest. The amended agreement provided a formula by which the price for the forced sale would be set. The very next day, they advised Saltzer that they were purchasing his share of [RLSA] for $63,389.00. They came to the purchase price by arbitrarily plugging numbers into their self-created formula. They had no factual basis for the valuation.

Pursuant to the terms of the disputed buyout provision, Rolka notified Saltzer that he and [Dr.] Loube had purchased Saltzer's ownership interest in [RLSA] effective August 15, 2014. The notice contained a check for a twenty percent (20%) of [the] $63,389 purchase price along with two promissory notes to cover the remaining obligation. In essence, they forced Saltzer to finance their purchase of his ownership interest. The check was drawn on the account of "Rolka Loube." [Rolka and Dr. Loube] continued to send checks to Saltzer as payments on the notes. However, Saltzer did not cash the down-payment check or subsequent checks for fear of acquiescing to the forced sale of his ownership interest. Instead, he brought this action.

…

All parties testified and presented experts to opine on their behalf as to the valuation of [RLSA]. [The trial court] accepted the fair value of [RLSA] as determined by Saltzer's expert, but reduced it by twenty-four percent (24%) based upon the testimony of [Rolka and Dr. Loube's] expert regarding the prospective risk associated with the loss of a major government contract.

Trial Court Opinion, 8/29/17, at 2-5. This factual summary is well supported by the record.

Saltzer's first issue on appeal, as well as both of Rolka's and Dr. Loube's issues on appeal, concern the court's valuation of Saltzer's membership interest. Rolka and Dr. Loube contend the court erred by not applying the formula in the amended operating agreement.

The court found that Rolka and Dr. Loube had amended the operating agreement in violation of the Limited Liability Company Act ("LLCA").[2] The original operating agreement did not contain a formula for a buyout of a member's ownership share of RLSA. Rolka and Dr. Loube voted to amend the operating agreement to include a default formula for calculating the value of a member's ownership share. Saltzer objected to the amendment.

Under the LLCA, the default rule required a unanimous vote of all members to modify the operating agreement. **See** 15 Pa.C.S.A. § 8942(b). Rolka and Dr. Loube correctly note that § 8942 allows the operating agreement to modify the default rule. **See id**. ("Except as provided … in writing in the operating agreement …").

Relying on this statutory exception, they assert the original operating agreement provided for amendment of the operating agreement by majority

---

[2] The court applied the Limited Liability Company Act of 1994, which was repealed and replaced by the Uniform Limited Liability Company Act, effective February 21, 2017. We will cite to repealed sections of the LLCA that were effective for the relevant times in this appeal.

vote. Every "Unit" of membership in RLSA was entitled to one vote. Operating Agreement, § 6.01. The RLSA provided for 1,000 units of membership, split 40/40/20 between Rolka, Dr. Loube, and Saltzer, respectively. Thus, Rolka and Dr. Loube each controlled 400 votes, while Saltzer controlled 200.

Rolka and Dr. Loube contend they were entitled to amend the operating agreement without Saltzer's consent, as their 800 votes constituted a majority of the votes possible. To determine if Rolka and Dr. Loube are correct, we must interpret and construe the operating agreement to see if it provides for its amendment by less than a unanimous vote.

An operating agreement is a contract between the members of an LLC. Interpretation of a contract poses a question of law and our review is plenary. *See Charles D. Stein Revocable Trust v. General Felt Industries, Inc.*, 749 A.2d 978, 980 (Pa. Super. 2000). "In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Id*. (citation omitted).

To discern the parties' intent, we must start with the language used by the parties in the written contract. *See Szymanski v. Brace*, 987 A.2d 717, 722 (Pa. Super. 2009). Generally, courts will not imply a contract that differs from the one to which the parties explicitly consented. *See Kmart of Pennsylvania, L.P. v. M.D. Mall Associates, LLC*, 959 A.2d 939, 944 (Pa.

Super. 2008). We are not to assume that the language of the contract was chosen carelessly or in ignorance of its meaning. ***See id***.

Where the language of the contract is clear and unambiguous, a court is required to give effect to that language. ***See Prudential Prop. and Cas. Ins. Co. v. Sartno***, 903 A.2d 1170, 1174 (Pa. 2006). Contractual language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." ***Hutchison v. Sunbeam Coal Co.***, 519 A.2d 385, 390 (Pa. 1986) (citations omitted). "This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." ***Madison Constr. Co. v. Harleysville Mut. Ins. Co.***, 735 A.2d 100, 106 (Pa. 1999) (citations omitted).

When a contract is found to be ambiguous, "extrinsic or parol evidence may be considered to determine the intent of the parties." ***Z & L Lumber Co. of Atlasburg v. Nordquist***, 502 A.2d 697, 700 (Pa. Super. 1985) (citations omitted). "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." ***Kripp v. Kripp***, 849 A.2d 1159, 1163 (Pa. 2004) (citation omitted).

Section 9.04 of the operating agreement provided for amendment "by vote of the Members at any annual or special meeting of the Members." This section does not explicitly state that a majority of votes can modify the

operating agreement in the absence of unanimous consent. Rolka and Dr. Loube therefore link this power to modify the operating agreement to § 6.02 of the operating agreement: "Except as otherwise provided in the [LLCA], or this Agreement, whenever any action is to be taken by vote of the members, it shall be authorized upon receiving the affirmative vote of a majority of the votes cast by all Members entitled to vote thereon."

We agree with the trial court that § 6.02 does not "provide in writing" that the operating agreement could be modified by less than a unanimous vote. In fact, § 6.02 clearly provides for majority vote "[e]xcept as otherwise provided in the [LLCA.]" There is no ambiguity in this section; since the LLCA required a unanimous vote, it provided otherwise. Thus, the LLCA's default provisions governed, and the court correctly held that modification of the operating agreement required a unanimous vote.

Rolka and Dr. Loube's remaining issue, as well as Saltzer's first issue, concern the mechanics of the trial court's calculation of the value of Saltzer's membership. Saltzer complains the court erred in discounting the value by 24% for risk involved with RLSA's main source of income, known as the TRS contract. The TRS contract was structured as five annual contracts, estimated to provide approximately $300,000 in profits per year. The fifth and final year was set to expire on June 30, 2016, but by the time of trial, the term had been extended to December 31, 2016.

Rolka and Dr. Loube's expert, David M. Weiss, CPA, opined that the value of RLSA should be discounted by 24% for the uncertainty arising from the possible non-renewal of the TRS contract. The trial court found this discount proper, and applied it when calculating the value of Saltzer's membership share. Saltzer argues this discount was inappropriate, as "[n]o evidence presented at trial, which occurred only days before the alleged expiration of the TRS revenue stream, even remotely suggested that the stream of income from the TRS contract would end." Appellant's Brief, at 30. In a similar argument, Rolka and Dr. Loube claim the court's valuation was in error, as the court did not apply a reduction for the personal goodwill owned by Rolka and Dr. Loube.

The court "found the opinion of Saltzer's expert[, Gayle L. Bollinger, CPA,] to be more credible." However, the court reduced Bollinger's valuation by 24% because Bollinger relied on information from after the date Rolka and Dr. Loube "purchased" Saltzer's membership interest. "She had not taken into account the uncertain nature of the company's largest contract because it continued on in the subsequent years. However, the appriopriate 'fair value' is the value on the date of dissociation." Trial Court Opinion, 8/29/17, at 9.

These credibility determinations were well within the trial court's discretion. The court credited Bollinger's valuation, which did not include a discount for the personal goodwill owned by Rolka and Dr. Loube, and not Weiss's. However, it believed Weiss insofar as he opined that a 24% risk

discount was appropriate. We cannot interfere with these credibility determinations.

Finally, Saltzer contends the court erred by not awarding punitive damages or attorney's fees. He highlights the court's findings that Rolka and Dr. Loube: a) breached their fiduciary duty to Saltzer, b) acted oppressively in forcing the sale on their terms, and c) did not pay Saltzer reasonable interest. He claims these findings support an inference that Rolka and Dr. Loube were at least recklessly indifferent in their breach of their fiduciary duty. He contends an award of punitive damages was necessary to punish their conduct.[3]

Punitive damages are awarded to punish a person and/or entity for "outrageous conduct." *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 802 (Pa. 1989) (citing Restatement (Second) Torts § 908(1)). Conduct is considered "outrageous" where a defendant's actions show either "an evil motive or reckless indifference to the rights of others." *J.J. DeLuca Company, Inc. v. Toll Naval Associates*, 56 A.3d 402, 415-416 (Pa. Super. 2012) (citation omitted).

> "Reckless indifference to the interests of others", or as it is sometimes referred to, "wanton misconduct", means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be

---

[3] Saltzer does not provide any independent basis for the award of attorney's fees; he merely includes his demand for attorney's fees as part of an award of punitive damages.

taken to have been aware of it, and so great as to make it highly probable that harm would follow.

***McClellan v. Health Maintenance Organization of Pennsylvania***, 604 A.2d 1053, 1061 (Pa. Super. 1992) (citations omitted).

The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed on review, provided that discretion has not been abused. ***See J.J. Deluca Company, Inc.***, 56 A.3d at 416.

Here, the court admitted that its decision not to award punitive damages was a "very close call." Trial Court Opinion, 8/29/17, at 10. While it found that Rolka and Dr. Loube had acted with "reckless indifference to the interests of Saltzer," it was also "satisfied that they subjectively believed they were acting within the law." ***Id***. It therefore determined an award of punitive damages would not "advance societal interests or deter future outrageous conduct." ***Id***.

The court balanced all of the attendant circumstances and did not conclude punitive damages were warranted. The court did not abuse its discretion in reaching this result, and Saltzer is due no relief on appeal.

In summary, we can find no error in the court's findings or legal reasoning. We therefore affirm the judgment.

Judgment affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/30/2018