### In the Matter of JEROME MARKOWITZ TRUST, Appellees.

**Appeal of Steven A. Markowitz, Trustee as well as Sandra Goldstein, Judy Markowitz, Marc Markowitz and Steven A. Markowitz.**

Superior Court of Pennsylvania.

Argued April 2, 2013.

Filed May 23, 2013.

---

Steven A. Bergstein, Allentown, for appellants.

Karl L. Prior, King of Prussia, for The Glenmede Trust Company, participating party.

BEFORE: STEVENS, P.J., OLSON, J., and STRASSBURGER, J.*

OPINION BY STEVENS, P.J.

This is an appeal from the April 16, 2012 Final Order entered in the Court of Common Pleas of Lehigh County, Orphans' Court Division, directing a surcharge of $11,700.00 to be imposed upon Glenmede Trust Company, N.A. ("Glenmede"), for its breach of fiduciary duty owed to Appellants[1] as it relates to investments Glenmede managed for the Jerome Markowitz Trust. On appeal, Appellants contend (1) the Orphans' Court's factual findings are not supported by competent and adequate evidence, (2) the Orphans' Court failed to acknowledge the full breadth of Glenmede's breach of its fiduciary duty to the Trust, (3) the Orphans' Court erred in failing to find Glenmede breached the parties' contract, and (4) the Orphans' Court erred in its calculation of the surcharge. We affirm.

The relevant facts and procedural history have been aptly set forth by the Orphans' Court, in part, as follows:

---

* Retired Senior Judge assigned to the Superior Court.

1. Appellants are Steven Markowitz, as trustee of the Jerome Markowitz Trust, and individually, as well as Marc Markowitz, Sandra Goldstein, and Judy Roberts, individually. Steven, Marc, Sandra, and Judy are the children of the late Jerome and Martha Markowitz.

[On November 6, 2009, Petitioner, Steven Markowitz, filed a] *Petition Seeking Reimbursement of Investment Funds and Other Relief From Glenmede Trust Company, N.A.,* ("hereinafter Markowitz's Petition")[.] [The petitioner sought] relief from Glenmede in relation to services Glenmede provided or failed to provide as the investment advisor, custodian, and agent for the Jerome Markowitz Revocable Trust under agreement dated October 6, 1983, as amended February 19, 1985 ("Trust").[2]

The petitioner is Steven Markowitz[.] Although *Markowitz's Petition* identifies the petitioner only as Steven Markowitz, individually, and not in his fiduciary capacity as Trustee of the Trust, the parties conducted the hearing as though [Steven] Markowitz brought this action in his capacity as Trustee. Therefore, we find that *Markowitz's Petition* was brought in [Steven] Markowitz's fiduciary capacity and all references herein to "Steven Markowitz" refer to Steven Markowitz as Trustee. [Moreover,] [b]y Order dated March 16, 2010, (approximately two months after the death of the life income beneficiary and cotrustee, Martha Markowitz, on January 29, 2010), Steven Markowitz, Marc Markowitz, Sandra Goldstein and Judy Roberts (the remaindermen of the Markowitz Trust) were added as individual petitioners. The Respondent is Glenmede, a corporation having its principal place of business at 1650 Market Street, Suite 1200, Philadelphia, Pennsylvania.

[Steven] Markowitz has been responsible for, and has managed, all financial aspects of the Trust since 1991. This included investments, distributions, disbursements, and responsibility for tax returns. It also included the selection of, and interaction with, investment managers or advisors for the Trust. [Steven] Markowitz is a sophisticated investor, experienced fiduciary and follower of the financial markets. Since 1992, [Steven] Markowitz has served as the sole trustee of Allen Organ's[3] $20 million pension fund and has had sole responsibility for making the pension fund's investment decisions. He also has served and continues to serve as Trustee of other trusts. [Steven] Markowitz has been assisted in his role as Trustee of the Trust and in connection with Allen Organ's corporate affairs and the Allen Organ pension fund by Allen Organ's Chief Financial Officer, Nathan Eckhart ("Eckhart"). Eckhart, a Certified Public Accountant, has provided accounting services to the Trust. Eckhart maintained Trust records and accounts, prepared Trust tax returns, reviewed monthly Trust statements, discussed Trust investment decisions with [Steven] Markowitz, participated in the selection of Trust investment advisors, communicated with Trust investment advisors on behalf of the Trust, and attended and participated in every quarterly meeting between Glenmede and [Steven] Markowitz.

The Trust was a majority shareholder in the Allen Organ Company. In 2006,

---

**2.** Jerome died on February 13, 1991. Under the Trust, Jerome's then surviving wife, Martha Markowitz, and their son, Steven Markowitz, were co-trustees. Martha died on January 29, 2010, and this action was amended to include the remaindermen of the Trust individually, *i.e.,* Jerome and Martha's children: Steven, Marc, Sandra Goldstein, and Judy.

**3.** Jerome was the founder of Allen Organ, which is a company that primarily manufactured digital organs. At Jerome's death, all of his shares of stock in Allen Organ passed into the Trust. Steven Markowitz was the president of Allen Organ.

in anticipation of the Trust's receipt of proceeds from the conversion of Allen Organ from a publicly held corporation to a closely held corporation, [Steven] Markowitz sought to hire an investment advisor. On August 16, 2006, he hired Wachovia Bank ("Wachovia") to hold the proceeds from the privatization of Allen Organ in its Short Term Investment Management ("STIM") product while the Trust explored long-term investment strategies. Wachovia's STIM portfolio at that time included Auction Rate Securities ("ARS"), [which] . . . typically refers to corporate or municipal bonds with a long-term nominal maturation date and for which the interest rate is regularly reset through an auction. Auctions are held usually every 7, 28, or 35 days and the interest on ARSs is paid at the end of each auction period. To participate in an auction, the owner of an ARS must possess the auction rights for that ARS. Auction rights are normally memorialized by a written document or are acknowledged by a remarketing agent. At all times relevant to this dispute, most ARSs were AAA rated and insured. In the event of a failure at auction, ARSs typically pay an increased interest rate to the ARS owner.

On August 31, 2006, the Trust (defined as "Client") entered into an Investment Management Agreement with Wachovia ("Wachovia Agreement"). Of significance to the present matter are Paragraphs 9, which provides that Wachovia "shall distribute Assets from the Account in accordance with the Client's written instructions" and Paragraph 13, which provides that, upon termination, "the assets then held by [Wachovia] shall be delivered as the Client may direct in writing and [Wachovia] shall have no further responsibility for the Account."

On September 28, 2006, [Steven] Markowitz and Eckhart met with Wachovia representatives to discuss investment issues and [Steven] Markowitz directed Wachovia to place $9 million of Trust funds in the STIM. The Trust deposited $9 million of Trust funds into the Trust's Wachovia Bank account ("Wachovia Account") on October 4, 2006.

By October 31, 2006, the Wachovia Account was invested 99.9% in fixed income tax exempt investment grade securities made in the ARS market. The Trust's ARS investments at the end of October 2006 included a $400,000 investment in Mobile County, Alabama Limited Obligation Warrants (Cusip # 607341AA2) ("Mobile ARS"). The Mobile ARS then had a Moody's Aaa rating and an AAA rating from Standard & Poor's Rating Services, meaning that it was investment grade and that there was little or no risk of default. Payment of the principal and interest on the Mobile ARS when due was also insured by a financial guaranty insurance policy issued by AMBAC Assurance Corporation. AMBAC's bond insurance business had an AAA rating from Standard & Poor's Rating Services as of October 2006 and held that rating until June 2008.

During the period that Wachovia served as temporary investment advisor, [Steven] Markowitz continued to meet with other candidates to serve as the Trust's long-term investment advisor. By late October 2006, [Steven] Markowitz had contacted Glenmede for this purpose. On October 30, November 16, and November 27, 2006, [Steven] Markowitz and Eckhart met with Glenmede representatives to discuss Glenmede's products and services and to review Glenmede's operations. On December 11, 2006, [Steven] Markowitz decided to retain Glenmede as an investment advisor

for the Trust and notified Wachovia that the Trust assets would be moved to another manager; Wachovia acknowledged receipt of this notification on the same date.

On December 12, 2006, [Steven] Markowitz and [then living] Martha, as co-trustees of the Trust, identified [collectively] as "Owner," and Glenmede, identified as "Glenmede," executed an Investment Advisory Agreement ("IAA")[.] [The IAA established] a contractual relationship between Glenmede and the Trust in which Glenmede agreed [to] establish an investment advisory account ("Account") in the Trust's name and to serve as the Trust's investment advisor, custodian, and agent, hold assets of the Trust, and provide investment management of the assets. The IAA does not contain any clause that mentions an investment policy statement or any reference to the IPS,[4] it does not indicate that the IAA is conditioned on the parties completing an investment policy statement, [but it does] state that the IAA, along with Glenmede's *Disclosure and Statement of Policy*, is the entire agreement between the parties and requires that any amendment thereto be signed by the party affected by the amendment.

On December 13, 2006, Glenmede mailed a letter of authorization to [Steven] Markowitz with directions that it be signed by [Steven] Markowitz and Martha as the first step in effectuating the transfer of Trust assets from Wachovia to Glenmede. On December 14, 2006, [Steven] Markowitz agreed to an "in-kind" transfer of the investments in the Wachovia Account to Glenmede, but indicated that the transfer not occur until January of 2007. On December 15, 2006, Wachovia representative Sharon

Malia prepared an Account Closing Request for the Trust assets held in the Wachovia Account. On December 27, 2006, Glenmede sent a letter to Wachovia, via Federal Express, for delivery on December 28, 2006, instructing Wachovia to transfer Trust assets "in-kind" to Glenmede.

Unbeknownst to [Steven] Markowitz or Glenmede, and despite having received and acknowledged notice of its removal as investment advisor on December 11, 2006, Wachovia, through its investment officer, continued to engage in purchases after that date, most significantly, on December 27, 2006, when it purchased a $300,000 investment in Jefferson County, Alabama Sewer Revenue Warrants (Cusip # 472682NH2) ("Jefferson ARS"). Like the Mobile ARS, the Jefferson ARS then had a Moody's Aaa rating and an AAA rating from Standard & Poor's Rating Services[.][It] was considered investment grade and was also insured by Financial Guaranty Insurance Corporation which had a Fitch AAA rating as of December of 2006 and held that rating until January of 2008. On December 28, 2006, the day after the purchase of the Jefferson ARS, Wachovia received the December 27, 2006 Federal Express letter instructing it to transfer all Trust assets to Glenmede.

The December 27, 2006 purchase of the Jefferson ARS was reflected on the December 2006 Wachovia Account statement which also included the Mobile ARS and fourteen (14) other ARSs. [Steven] Markowitz received and reviewed a copy of the December 2006 Wachovia Account statement on or about its issue date, and [he] did not question the December 27, 2006 purchase of the Jeffer-

---

4. IPS refers to an "Investment Policy Statement."

son ARS or the investment suitability of fourteen (14) other ARSs identified therein.

On January 4, 2007, [Steven] Markowitz and Glenmede jointly created an [IPS], the purpose of which was to "provide a clear understanding of the Trust's goals, objectives, expectations and constraints applicable to the management of the investment portfolio." It specified that the "most important objectives for the account are preservation of capital, real growth after inflation, liquidity and minimizing taxes." The IPS further set forth particularly relevant items as follows:

1.) "Portfolio Size: $12,280,000."

2.) "Permissible Asset Classes" included Cash, Fixed Income, Equities and Alternative Assets. The Fixed Income class included Investment Grade Bonds.

3.) "Term: The investment time horizon is less than 5 years."

4.) "Liquidity Needs: For liquidity, the client would like to maintain cash reserves as dictated by Glenmede policy."

5.) "Investment Authority: Glenmede has sole investment authority."

6.) "Other: Cash includes $3,000,000 for outside private investment by trustee."

7.) The Asset Allocation Target for Fixed Income was between 22% and 42%.

The IPS listed investment grade bonds as a permissible class of asset for the fixed income portfolio. As of January 2007, ARSs were considered investment grade bonds. The IPS does not indicate that it is an amendment, addendum, or supplement to the IAA, does not refer to the IAA in any way, and was not executed by either of the parties.

On January 4, 2007, Wachovia notified its personnel that the Trust relationship had been terminated and that Trust assets were to be sent "in-kind" to Glenmede. Glenmede notified [Steven] Markowitz that the transfer had not occurred as of January 17, 2007. On that date, Eckhart, on behalf of [Steven] Markowitz, contacted Wachovia and requested that it complete the transfer as soon as possible. By January 18, 2007, Wachovia had agreed to expedite the transfer process.

On January 22, 2007, Wachovia transferred to Glenmede the majority of Trust assets in its possession, comprised of sixteen (16) investments, eleven (11) of which were ARSs, the Jefferson ARS, and the Mobile ARS among them. However, Wachovia's January 22, 2007 transfer of the eleven (11) ARSs failed to include the auction rights associated with each ARS. On or about February, 2007, when it realized that Wachovia had failed to transfer the auction rights and/or to notify remarketing agents, Glenmede instructed its employee, Richard Gale ("Gale"), to obtain the auction rights for the ARSs. Glenmede did not inform [Steven] Markowitz that it had not received the auction rights from Wachovia. Gale was not directed by Glenmede or [Steven] Markowitz to liquidate any of the ARSs.

Glenmede mailed, and [Steven] Markowitz received, a Statement of Account dated January 31, 2007, which identified all assets held by Glenmede as of that date, including the ARSs that Wachovia had transferred to Glenmede on January 22, 2007.

At no time relevant to this dispute has Glenmede had a policy against ARS investments or a standing direction that ARSs must be liquidated. As investment grade holdings, the bonds were permissible investments and fell within the class of assets that [Steven] Markowitz selected when he characterized the Account as "Growth with Income."

Moreover, throughout the entire period of time Glenmede held the ARSs, [Steven] Markowitz never directed Glenmede to liquidate the ARSs. Nonetheless, Glenmede preferred not to invest in ARS, so it decided to attempt to sell the ARSs at auction.

By early February 2007, Gale had spoken with Wachovia's Sharon Malia regarding the ARSs. Gale also contacted various Wachovia Securities personnel, whom he knew, to enlist their help in obtaining auction rights. Through Gale's efforts, Glenmede was able to obtain auction rights for some, but not all, ARSs, and to successfully liquidate certain ARSs without auction rights. During the period of February, 2007, through March, 2007, Glenmede liquidated five (5) ARSs, carried at an aggregate value of $2.4 million. Each of the ARSs retained in the account generated interest income on a monthly basis. On April 9, 2007, although Glenmede was not able to auction the Mobile ARS, that ARS was partially called and the Trust received $25,000 in cash, leaving the Trust with $375,000 in that ARS. (Because of a subsequent partial call in March, 2008, the carrying value of the Mobile ARS at the time the Account was transferred was $350,000).

All of the investment activity and the maturation date of each bond was reported on Glenmede's monthly Statements of Account sent to [Steven] Markowitz. In addition, Glenmede made presentations to [Steven] Markowitz on or about April 11, 2007, July 11, 2007, October 5, 2007, December 12, 2007, January 29, 2008, and April 3, 2008. At each presentation, [Steven] Markowitz received a spiral-bound presentation document, which included a tab for "Asset Class Summary" and within that tab a then current Asset List. The Asset List included a Fixed Income compo-nent. The Fixed Income component contained a complete list of the municipal bonds held by the Trust. During this same period, Glenmede also had email communication with [Steven] Markowitz and/or Eckhart related to Trustee fees, investment allocation, and investment strategy.

Glenmede produced no documentation of any efforts it made to obtain the auction rights for the ARSs that remained in the Account during the period March, 2007 to March, 2008. In contrast to its actions in January 2007 when it informed [Steven] Markowitz that Wachovia was slow to transfer the investments to Glenmede, which prompted Eckert to contact Wachovia to "expedite" the transfer, Glenmede chose not to inform [Steven] Markowitz that it was having difficulty obtaining the auction rights for the ARSs.

In late February, 2008, as one of several consequences of the massive and unforeseen collapse of the mortgage-backed securities market, the market for auction rate securities became volatile and auctions began to fail. In February, 2008, when Glenmede was confronted with this unprecedented market instability it resumed its efforts to obtain auction rights for the ARS. Through a series of March, 2008 communications with Wachovia, Glenmede successfully obtained auction rights for all of the ARS[s] still held by the Trust.

On April 3, 2008, Glenmede held a quarterly presentation with [Steven] Markowitz and discussed the seizure of the ARS market, [as well as] its efforts to obtain auction rights for the ARSs and to liquidate the ARSs. This was the first time Glenmede informed [Steven] Markowitz of the ARS market problems and the fact that it had not obtained

auction rights for all of the ARSs in the Account.

Glenmede continued to liquidate the ARSs and, by May 27, 2008, Glenmede had liquidated all ARSs but the Mobile ARS and the Jefferson ARS. All of the investment activity was reflected in the monthly Statement of Account provided to [Steven] Markowitz.

On October 13, 2008, the Trust sued Wachovia for its handling of the ARSs. (That litigation was settled in August, 2010).[5] On April 20, 2009, the Trust instituted this action against Glenmede for its handling of the ARSs (though the Second Amended Petition was not filed until November 6, 2009).

In May, 2009, the Trust formally terminated its relationship with Glenmede. Accordingly, between May 6 and 21, 2009, Glenmede sold every investment except the Jefferson ARS, the Mobile ARS (which collectively constituted 6.6% of the Account), and another asset that is not at issue. On May 21, 2009, Glenmede delivered $8.9 million cash and the Jefferson ARS and Mobile ARS in-kind, at values of $300,000 and $350,000, respectively, to BNY–Mellon, the custodian for [Steven] Markowitz's new investment advisor, thereby emptying the Trust's Glenmede Account as of May 21, 2009. The Jefferson ARS and the Mobile ARS were received by BNY–Mellon at the values of $300,000 and $350,000 in May, 2009. Approximately two weeks after [Steven] Markowitz terminated his contract with Glenmede, he calculated and paid himself Trustee commissions as a percentage of the Trust's gross assets that included the par values of both the Jefferson ARS ($300,000) and the Mobile ARS ($350,000).

The Mobile ARS had been issued as part of the Limited Obligation School Warrants, Series 2003, issued by Mobile County, Alabama ("Series 2003 Warrants"). On or about August 25, 2009, the Public Educational Building Authority of the City of Mobile, Alabama issued an Official Statement in which it declared that it would be issuing Limited Obligation School Bonds, Series 2009–A ("Series 2009–A Bonds") and stated that the purpose of the issuance of the Series 2009–A Bonds was to raise money that would be used to retire, or redeem, the Series 2003 Warrants.

In an email sent to [Steven] Markowitz's counsel on October 8, 2009, Glenmede forwarded the Official Statement to the Trustees and encouraged them to investigate its application to the Mobile ARS, now held by BNY–Mellon. On October 9, 2009, the Trustees, by counsel, stated that they had concluded that there was little likelihood that the Mobile ARS would be covered by the Official Statement issued on or about August 25, 2009. In response, Glenmede, through counsel, advised the Trustees that Glenmede had researched the issue, believed the Official Statement applied to the Mobile ARS, and was confident that the Mobile ARS would be redeemed at full face value.

Before selling the Mobile ARS, neither the Trustee nor their agents contacted the Public Educational Building Authority of the City of Mobile, Alabama, bond counsel, Haskell Slaughter Young & Rediker, LLC, of Birmingham, Alabama or the bond underwriter or did anything to investigate and determine whether the Mobile ARS would be redeemed as a result of issuance of the Series 2009–A Bonds. [Steven] Markowitz directed that BNY–Mellon sell the Mobile ARS, and on October 30,

---

**5.** Wachovia is not a party in the instant appeal.

2009, the Mobile ARS was sold for $234,500, which represented 67% of its $350,000 par value. Slightly more than a month later, on December 9, 2009, the Series 2003 Warrants were redeemed at full par value. Had it not been sold by [Steven] Markowitz, the Trust would have realized no loss.

On October 30, 2009, also at [Steven] Markowitz's direction, the Jefferson ARS was sold and the Trust realized $90,000, which represented 30% of its $300,000 par value. As of the final day of the hearing, May 12, 2011, the Jefferson ARS had not been declared in default and continued to pay all ARS holders increased interest.

Orphans' Court Opinion filed 12/8/11 at 1–13 (footnotes added).

Ultimately, the action against Glenmede proceeded to a bench trial, and by Order and Opinion entered on December 8, 2011, the Orphans' Court denied, in part, and granted, in part, the relief requested by Appellants. Specifically, the Orphans' Court directed "Glenmede is surcharged in the amount of $11,700.00, which it shall pay to [Appellants] within thirty (30) days of the date of this Order."

On December 21, 2011, Appellants filed timely Exceptions to the Orphans' Court's December 8, 2011 Order and Opinion,[6] and on April 3, 2012, Glenmede filed a post-trial response to Appellants' Exceptions. By Order entered on April 16, 2012, the Orphans' Court granted, in part, and denied, in part, Appellants' Exceptions. However, ratifying and confirming the ultimate conclusion of the December 8, 2011

Order and Opinion, the Orphans' Court directed "that a surcharge in the amount of $11,700.00 is imposed upon Glenmede for its breach of fiduciary duty owed to [Appellants], and that said surcharge shall be paid to [Appellants] within thirty (30) days." On April 27, 2012, Appellants filed the instant timely notice of appeal.[7] By Order entered on May 11, 2012, the Orphans' Court directed Appellants to file a Pa.R.A.P. 1925(b) Statement, Appellants timely complied, and the Orphans' Court filed a brief Pa.R.A.P. 1925(a) Opinion referring to its December 8, 2011 Opinion.

Appellants' first issue is the Orphans' Court's factual findings are not supported by competent and adequate evidence. Appellants point to numerous alleged erroneous factual findings and/or the omission of certain proper factual findings, which they suggest contributed to the Orphans' Court's ultimate improper ruling. We shall review each challenged "factual finding" or "omission" below.

Initially, we note the following standard of review in this matter:

The standard for reviewing an Orphan's Court findings is deferential.

The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the

---

**6.** *See* Pa.O.C. Rules 7.1(a) ("[N]o later than twenty (20) days after entry of an order, decree or adjudication, a party may file exceptions to any order, decree or adjudication which would become a final appealable order under Pa.R.A.P. 341(b) or Pa.R.A.P. 342 following disposition of the exceptions.").

**7.** *See* Pa.O.C. Rules 7.1(a) ("If exceptions are filed, no appeal shall be filed until the disposition of exceptions[.]"); Pa.R.A.P. 903 (indicating a notice of appeal shall be filed within 30 days after the entry of the order from which the appeal is taken).

opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence.

When the [Orphans'] Court has come to a conclusion through the exercise of its discretion, the party complaining on appeal has a heavy burden. It is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record, discretion is abused. A conclusion or judgment constitutes an abuse of discretion if it is so lacking in support as to be clearly erroneous.... If the lack of evidentiary support is apparent, reviewing tribunals have the power to draw their own inferences and make their own deductions from facts and conclusions of law. Nevertheless, we will not lightly find reversible error and will reverse an orphans' court decree only if the orphans' court applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported by the record.

*In re Estate of Warden,* 2 A.3d 565, 571 (Pa.Super.2010) (citations and quotations omitted).

Appellants' first alleged improper factual finding is "that somehow [Steven] Markowitz was aware that these investments were ARS and therefore problematic." *See* Appellants' Brief at 19. However, Appellants have not pointed to the place in the record where the Orphans' Court made this factual finding. Appellants admit "this is actually unstated, but implied," by the Orphans' Court's Opinion. *See* Appellants' Brief at 19. In any event, the Orphans' Court was free to weigh the evidence in this regard, and under our enunciated standard of review, we find no relief is due. *See In re Estate of Warden, supra.*

Appellants' next alleged improper factual finding is "[Richard] Gale was not directed by Glenmede or [Steven] Markowitz to liquidate any of the ARSs." *See* Appellants' Brief at 20; Orphans' Court Opinion filed 12/8/11 at 9. Appellants contend this factual finding by the Orphans' Court is in conflict with the Orphans' Court's finding that "[w]e agree with [Steven] Markowitz that Glenmede did a poor job in effectuating its investment decision made in February 2007 to liquidate all of the ARSs that it had received via transfer from Wachovia in January, 2007." *See* Appellants' Brief at 20; Orphans' Court Opinion filed 12/8/11 at 24. We reject Appellants' contention that these two findings are inherently contradictory. The fact the Orphans' Court found Glenmede had made a "decision" to liquidate the ARSs, but did not effectively do so, does not require the conclusion there was a concurrent "direction" by Glenmede to Gale to actually liquidate the ARSs. Thus, under our standard of review, no relief is due. *See In re Estate of Warden, supra.*

Appellants' next alleged improper factual finding is "[Steven] Markowitz failed to prove Glenmede was not qualified to administer ARSs[.]" *See* Appellants' Brief at

21; Orphans' Court Final Order filed 4/16/12 at 3. First, we note this is a legal conclusion and not a factual finding *per se.* In any event, under our standard of review, we conclude this finding/conclusion is supported by adequate and competent evidence, and the Orphans' Court was free to make the appropriate credibility determinations in this regard. *See In re Estate of Warden, supra;* N.T. 5/12/11 at 103–106 (Glenmede employee, Laura LaRosa, testified about Glenmede's handling of ARSs for various clients). We simply will not reweigh the evidence. *See In re Estate of Warden, supra.*

Appellants' next alleged improper factual finding is "[Steven] Markowitz introduced no evidence regarding whether, or at what price, the Jefferson ARS and the Mobile ARS could have been sold during the period of February 2007 through March 2008 had Glenmede possessed the necessary auction rights." *See* Appellants' Brief at 22; Orphans' Court Opinion filed 12/8/11 at 25. We find this not a factual finding *per se;* but rather, this is more properly characterized as a legal conclusion. In any event, as Appellants admit, the Orphans' Court remedied any error in this regard when it granted Appellants' Exception #1 and concluded "[t]he record does contain evidence that the price at which the Jefferson ARS and the Mobile ARS could have been sold had auction rights been included in the transfer from Wachovia was their par value." *See* Appellants' Brief at 22; Orphans' Court Final Order filed 4/16/12 at 1.

■ Appellants' next alleged improper factual finding is "Glenmede breached that [fiduciary] duty when it decided not to inform [Steven] Markowitz of its lack of auction rights to the ARS as soon as it knew that not having them was anything more than an annoyance (in February, 2008 when auctions began to fail)[.]" *See* Appellants' Brief at 22–23; Orphans' Court Final Order filed 4/16/12 at 3. Appellants contend the evidence reveals Glenmede knew well before February of 2008 that the lack of auction rights was "more than an annoyance." Appellants' Brief at 23. Additionally, intertwined within this argument, Appellants contends the Orphans' Court erred in finding the crash of the ARS market in late February, 2008 was "unforeseen." *See* Appellants' Brief at 23; Orphans' Court Opinion filed 12/8/11 at 10. Under our standard of review, we conclude these findings are supported by adequate and competent evidence, and the Orphans' Court was free to make the appropriate credibility determinations in this regard. *See In re Estate of Warden, supra;* N.T. 5/12/11 at 124–125 (Glenmede employee, Laura LaRosa, testified there was no "crystal ball" to predict the crash of the market).

■ Appellants contend the Orphans' Court erred in failing to find that Glenmede made "deliberate false deceptive statements." *See* Appellants' Brief at 24. However, Glenmede's Chief Counsel James Belanger testified Glenmede made "an honest mistake" in this case and no Glenmede employee deliberately lied to Steven Markowitz or his attorney. N.T. 1/28/11 at 112. The Orphans' Court was free to weigh the evidence and accept Mr. Belanger's testimony in this regard. *See In re Estate of Warden, supra.*

Appellants contend the Orphans' Court erred in refusing to hold Glenmede responsible for violations of the Code of Federal Regulations. *See* Appellants' Brief at 24. This is tantamount to a legal conclusion and not a factual finding. In any event, based upon the record and Appellants' scant appellate argument, we find no abuse of discretion in this regard. *See In re Estate of Warden, supra.*

Appellants contend the Orphans' Court erred in finding "[b]ecause the majority of the ARS holdings were successfully liquidated by Glenmede well within the five (5) year investment horizon articulated in the IPS ... there was no failure to meet the liquidity objective contained in the IPS." *See* Appellants' Brief at 27; Orphans' Court Opinion filed 12/8/11 at 22. This is tantamount to a legal conclusion and not a factual finding. In any event, inasmuch as the record supports the Orphans' Court's finding that the Mobile and Johnson ARSs represented no more than 6% of the account, and Steven Markowitz testified "liquidity" under the parties' IPS meant access to the "lion's share" of the money account, we find no abuse of discretion on the part of the Orphans' Court. *See In re Estate of Warden, supra;* N.T. 2/4/11 at 223–224.

In light of the aforementioned, we find the Orphans' Court's factual findings are supported by competent and adequate evidence, and there is no abuse of discretion. *See In re Estate of Warden, supra.* Therefore, we find no merit to Appellants' first issue.

Appellants' next issue is the Orphans' Court erred in concluding Glenmede breached its fiduciary duty **solely** on the basis it did not inform Steven Markowitz of the lack of auction rights for the ARSs in a timely manner.[8] *See* Appellants' Brief at 29. That is, Appellants contend the evidence additionally supports the conclusion Glenmede breached its fiduciary duty to Appellants as it relates to Glenmede "positioning itself favorably vis-à-vis responsibility for the delay" in obtaining the Mobile ARS and Jefferson ARS auction rights and not passing on the relevant information to Steven Markowitz. *See* Appellants' Brief at 20. Appellants contend the Orphans' Court should have concluded Glenmede breached its fiduciary duty on this basis.[9] *See* Appellants' Brief at 29.

We summarily reject this argument. In its Opinion, in discussing Glenmede's breach of its fiduciary duty to Appellants, the Orphans' Court stated, in relevant part, the following:

> Glenmede was more concerned with positioning itself favorably vis a vis responsibility for the delay in its receipt of auction rights, than passing along the relevant market information. Glenmede's conduct in this regard falls short of the scrupulous good faith and candor that are the cornerstones of a fiduciary relationship and **constitutes a breach of the fiduciary duty.**

Orphans' Court Opinion filed 12/8/11 at 25 (bold added).

Contrary to Appellants' suggestion, the Orphans' Court specifically concluded Glenmede breached its fiduciary duty on the basis it was more concerned with "positioning itself favorably vis a vis responsibility for the delay in its receipt of the auction rights" than it was with passing the relevant information to Steven Markowitz. Thus, we need not discuss this issue further.

---

**8.** Appellants admit the Orphans' Court concluded that Glenmede should have informed Steven Markowitz of the lack of auction rights for the ARSs by at least February of 2008, instead of waiting until March of 2008. *See* Appellants' Brief at 29.

**9.** We note "[a] trust is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person[.]" *In re Trust of Hirt,* 832 A.2d 438, 447–48 (Pa.Super.2003) (citation omitted). "[T]he pole star in every trust ... is the settlor's ... intent and that intent must prevail." *Estate of Pew,* 440 Pa.Super. 195, 655 A.2d 521, 533 (1994) (quotation omitted).

■ Appellants' next issue is the evidence supported the conclusion Glenmede breached its duties under the parties' Investment Advisory Agreement (IAA), which was dated December 12, 2006, and the Orphans' Court erred in failing to find otherwise.

Initially, although Appellants have failed to enunciate the law as it pertains to contracts, we note the following relevant legal precepts:

When interpreting the language of a contract, the intention of the parties is a paramount consideration. In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.

When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.

On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is obscure in meaning through indefinite-

ness of expression or has a double meaning. Where the language of the contract is ambiguous, the provision is to be construed against the drafter.

*State Farm Fire & Cas. Co. v. PECO,* 54 A.3d 921, 928 (Pa.Super.2012) (quotations, quotation marks, and citations omitted).

Here, the relevant provisions of the IAA provided the following concerning Glenmede's obligations, duties, and liability:

## 3. INVESTMENT MANAGEMENT

Glenmede will provide to Owner on an ongoing basis investment management of the Assets as [follows]:

A. **Discretionary Account**—Glenmede shall periodically review the Account and shall have full discretionary authority to make all investment decisions concerning purchasing, holding or selling the Assets taking into account the Owner's investment objectives. Consistent with Owner's investment objections, and subject to any restrictions Owner may impose in writing, Glenmede will invest in securities of any kind, including, but not limited to, investing in mutual funds or investment companies that are managed by Glenmede. From time to time, all or a portion of the Account may be held in cash or cash equivalents. The Owner hereby grants to Glenmede, and confirms that Glenmede has, the authority to act as the Owner's agent and attorney in fact with respect to the Assets in the Account. This authorization is a continuing one and shall remain in full force and effect until limited or terminated by Owner by written notification to Glenmede. In buying, selling, or trading in securities or other assets on behalf of the Owner, Glenmede shall act in its sole discretion and shall have no responsibility to consult with, or receive approval from, the Owner prior to any such transactions.

IAA dated 12/12/06 at Paragraph 3A (bold in original).

## 18. LIABILITY

Glenmede shall not be liable to the Owner or any other person except for losses to the Account resulting from the willful misfeasance, bad faith, or gross negligence on the part of Glenmede in the performance of its duties, or reckless disregard by Glenmede of its obligations and duties, under this Agreement. The federal and certain state securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore nothing herein shall in any way constitute a waiver or limitation of any rights that the undersigned may have under any federal or state securities law.

IAA dated 12/12/06 at Paragraph 18 (bold in original).

Here, in finding there was no evidence supporting the conclusion Glenmede breached the parties' IAA, the Orphans' Court stated, in pertinent part, the following:

The closest [Steven] Markowitz came to presenting standard of care evidence was the testimony of Kevin Karpuk of Cornerstone, the Trust's current investment advisor. He purported to be an expert, but provided only general information about investments and did not provide standard of care testimony. In any event, we do not find this testimony credible or useful to this case.

\* \* \*

[Steven] Markowitz's claim that Glenmede represented to him that it had expertise in ARSs but, in fact, it did not, and that such conduct constitutes willful misfeasance, we find to be without merit. The evidence showed that Glenmede was well familiar with ARSs and [Steven] Markowitz introduced no evidence in support of his allegation that Glenmede made any express representations to him about its knowledge of ARSs.

We are similarly unpersuaded by [Steven] Markowitz's claim that Glenmede had a contractual obligation to inform him that it had not received the auction rights as soon as it became aware of this fact. Because [Steven] Markowitz selected the *Discretionary Account* option in the IAA rather than the *Non–Discretionary Account*, he delegated sole discretion regarding investments to Glenmede. Because [Steve] Markowitz did not produce the requisite expert evidence that the "freeze" of the bond market that occurred in March 2008 was foreseeable in January 2007, we find that the fact that Glenmede was without the auction rights for the ARSs received via transfer from Wachovia in January 2007, was, at that time, not so much noteworthy as bothersome. This is especially true in light of the express language of the IAA that, in carrying out its investment duties for [Steven] Markowitz, Glenmede " ... shall have no responsibility to consult with or receive approval from [Steven Markowitz] prior to any such transactions."

Although [Steven] Markowitz asserts that a key objective of the investment strategy for the Trust was liquidity, that objective is only mentioned in a general sense and not with respect to any particular asset or type of investment. [Steven] Markowitz produced no document in which the ARSs were identified as assets that Glenmede was to liquidate immediately upon taking possession or within a specified period of time thereafter. [Steven] Markowitz knew that the Jefferson ARS and the Mobile ARS were included in the Trust assets that were transferred from Wachovia to Glenmede in January, 2007. The Jefferson ARS and the Mobile ARS were list-

ed on every Glenmede statement of Account that he received over the course of 2007 and 2008. [Steven] Markowitz never directed Glenmede to liquidate the ARSs or even inquired why they remained unliquidated. Because the majority of the ARS holdings were successfully liquidated by Glenmede well within the five (5) year investment horizon articulated in the IPS, despite the delay in obtaining auction rights, the lack of a primary market for the Mobile ARS and the Jefferson ARS, which represented slightly more than 6% of the Account, there was no failure to meet the liquidity objective contained in the IPS.

Orphans' Court Opinion filed 12/8/11 at 20–22.

We find no abuse of discretion in this regard, and therefore, we find Appellants' issue to be meritless. *See In re Estate of Warden, supra.*

■ Appellants' final claim is the proper measure of the surcharge is $325,500.00, which represents the amount lost by the Trust by the forced sale of the Jefferson and Mobile ARSs in the secondary market.[10] Thus, Appellants contend the Orphans' Court erred in ordering a surcharge of $11,700.00.

■ Preliminarily, we note "[t]he primary duty of a trustee is the preservation of the assets of the trust and the safety of the trust principal." *In re Estate of Warden,* 2 A.3d at 573 (quotations, quotation marks, and citations omitted). Additionally, before a surcharge is ordered, the Orphans' Court must conclude, as it did in the case *sub judice,* that the trustee breached its fiduciary duty. *See id.* ("Where there is no breach of fiduciary

duty, there is no basis for a surcharge.") (citations omitted).

Once a breach of fiduciary duty is established, the Orphans' Court may impose a surcharge to compensate for any loss caused by the fiduciary's breach. *See id.* Additionally, however, this Court has suggested the Orphans' Court may impose a surcharge as punishment for the fiduciary's improper conduct. *See In re: Paxson Trust I,* 893 A.2d 99 (Pa.Super.2006).

In the case *sub judice,* in determining the surcharge to be imposed for Glenmede's breach of its fiduciary duty, the Orphans' Court indicated the following:

[Steven] Markowitz contends that Glenmede should be ordered to "reimburse" him a sum equal to the loss he realized on his sale of the Jefferson ARS and the Mobile ARS in October 2009, or $325,500. We disagree. [Steven] Markowitz introduced no evidence regarding whether, or at what price, the Jefferson ARS and the Mobile ARS could have been sold during the period of February 2007 through March 2008 had Glenmede possessed the necessary auction rights. "The propriety of an investment ... must be judged as it appeared at the time it was made and not as viewed in the light of subsequent events." *Estate of Pew,* 655 A.2d [at 543]. By April 2008, the ARS market had frozen, so there was no decision to be made regarding the ARSs, except whether to sell them at a discount or hold them and continue to earn interest and possibly sell them later. Glenmede's April 2008 disclosure did not cause a loss to the Trust or cause [Steven] Markowitz to do anything other than to sue Wachovia. As of May 21, 2009, the last day the

---

**10.** Appellants also summarily seek counsel fees for the lawsuits against Wachovia and Glenmede. Aside from stating they are entitled to the fees, Appellants have not developed a proper argument with regard thereto. *See* Appellants' Brief at 36–37. Thus, we decline to address the issue of counsel fees further. *See* Pa.R.A.P. 2119.

Glenmede Account held the Trust assets, no loss had been realized. Indeed, [Steven] Markowitz shortly thereafter paid himself a commission calculated on the full par value of those two (2) investments. It is also significant that [Steven] Markowitz sold the Mobile ARS in October 2009, notwithstanding his receipt of information from Glenmede in August 2009 that it was reasonably likely that the Mobile ARS would be redeemed at par within several months, without adequately investigating the reliability of the information and Glenmede's assessment. Had he not sold the Mobile ARS in October 2009, he would not have realized any loss on that investment. Under Pennsylvania law, an essential element of surcharge is proof of loss. *In re Mendenhall,* 484 Pa. 77, 82, 398 A.2d 951, 954 (1959) [ (1979) ]. For these reasons, [the court] find[s] that the loss [Steven] Markowitz realized on his sale of the Jefferson ARS and the Mobile ARS is not the proper measure of a surcharge for Glenmede's breach of its fiduciary duty.

[The court] is similarly unpersuaded that denial of any compensation to Glenmede for its approximately twenty-nine (29) month tenure as investment advisor is an appropriate surcharge. Neither party produced evidence regarding the method of calculation of the $161,549.42 fee paid to Glenmede. Thus, we are left to simple arithmetic and discretion. The fee paid to Glenmede ($161,549.42) represents 1.8% of the Trust assets that it was given to invest ($9 million). Applying that percentage to the aggregate $650,000 carrying value of the Mobile ARS and the Jefferson ARS (which is the value at which those assets were reflected on receipt and upon transfer by Glenmede); reveals that the amount of compensation attributable to those two investments is $11,7000.00. Accord-

ingly, [the court] ... impose[s] a surcharge upon Glenmede in the amount of $11,700.00 for breach of its fiduciary duty.

Orphans' Court Opinion filed 12/8/11 at 25–26 (quotation and quotation marks omitted).

We find no abuse of discretion in this regard. *See In re Estate of Warden, supra.*

For all of the foregoing reasons, we affirm.

Affirmed.

STRASSBURGER, J. CONCURS IN RESULT.