J-A16036-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ALLEGHENY ENERGY SUPPLY COMPANY, LLC; AND MONONGAHELA POWER COMPANY, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellees | : | |
| | : | |
| v. | : | |
| | : | |
| WOLF RUN MINING COMPANY, FORMERLY KNOWN AS ANKER WEST VIRGINIA MINING COMPANY, INC., AND HUNTER RIDGE HOLDINGS, INC., FORMERLY KNOWN AS ANKER COAL GROUP, INC., | : | |
| | : | |
| Appellants | : | No. 1853 WDA 2013 |

Appeal from the Order entered on October 24, 2013
in the Court of Common Pleas of Allegheny County,
Civil Division, No. GD 13-005047

BEFORE:  DONOHUE, OTT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED JANUARY 30, 2015**

Wolf Run Mining Company ("Wolf Run"), and its parent company, Hunter Ridge Holdings, Inc. ("Hunter Ridge"), appeal from the trial court's October 24, 2013 Order declaring that Wolf Run cannot take advantage of a price renegotiation clause set forth in a 2005 Coal Sales Agreement ("the Agreement") between Wolf Run and the appellees, Allegheny Energy Supply Company, LLC, and Monongahela Power Company (collectively, "Allegheny Energy").  We affirm.

On February 17, 2005, Allegheny Energy entered into the Agreement with Wolf Run,[1] whereby Allegheny Energy agreed to purchase all coal from existing reserves of Wolf Run's Sycamore No. 2 Mine. Wolf Run's performance under the Agreement was guaranteed by Hunter Ridge,[2] the parent company of Wolf Run.

Prior to the execution of the Agreement, Allegheny Energy entered into a separate contract with Wolf Run for delivery of coal from Wolf Run's Sycamore No. 1 Mine. Wolf Run closed its Sycamore No. 1 Mine before the required tonnage under that contract was delivered. To account for this shortfall, Section 1.3 of the Agreement specified that delivery shortfalls from the Sycamore No. 1 Mine would be covered by coal from the Sycamore No. 2 Mine, at the prices that had been previously established for the Sycamore No. 1 Mine.[3]

---

[1] At that time, Wolf Run was known as Anker West Virginia Mining Company, Inc. ("Anker West Virginia").

[2] Hunter Ridge was formerly known as Anker Coal Group, Inc. ("Anker Coal"). In March of 2006, shortly after the parties entered into the Agreement, Anker Coal was acquired by, and consolidated into, International Coal Group ("ICG"). Following the consolidation, Anker West Virginia changed its name to Wolf Run, and parent company Anker Coal changed its name to Hunter Ridge. Under the terms of the acquisition, Wolf Run remained a subsidiary of Hunter Ridge, while Hunter Ridge became a subsidiary of ICG. For clarity, we refer to the entities by their present names, Wolf Run and Hunter Ridge.

[3] At the time the parties entered into the Agreement, the existing reserve of the Sycamore No. 2 Mine was estimated to contain not less than 20 million tons of coal.

The Agreement provided that Wolf Run would deliver to Allegheny Energy (a) throughout 2005 until September of 2006, the actual production of the Sycamore No. 2 Mine, which was estimated at 500,000 tons;[4] (b) beginning on October 1, 2006, 150,000 tons per month;[5] and (c) beginning in January 2007 through the expiration of the Agreement, 1.8 million tons of coal per year until the Sycamore No. 2 reserves were exhausted.[6]

During the summer of 2006, the operations at the Sycamore No. 2 Mine were idled temporarily. As this Court described in a prior appeal,

> Wolf Run attributed the closing to the accidental breach of an abandoned gas well, changes in the enforcement of regulations for mining within the vicinity of the gas well, and a collapsing mine roof. As a result, in August 2006, Wolf Run informed Allegheny Energy that it would be unable to meet its obligations under the Agreement. On August 25, 2006, Wolf Run issued a formal *force majeure* notice pursuant to Section 13 of the Agreement[,] wherein it averred that the conditions leading to the idling of the Sycamore No. 2 Mine were beyond its control, and not the result of its fault or negligence.[FN] To cover the delivery shortfalls[,] Allegheny Energy purchased coal from third party suppliers.

---

[4] ***See Allegheny Energy Supply Co. v. Wolf Run Mining Co.***, 53 A.3d 53, 56 (Pa. Super. 2012).

[5] ***See id.***

[6] ***See id.***

[FN] In September of 2007, the Sycamore No. 2 Mine was reopened, and deliveries of coal to Allegheny Energy resumed, but production fell below the tonnage required under the Agreement.

On December 18, 2006, Allegheny Energy instituted a breach of contract action against Wolf Run, Hunter Ridge and ICG[,] based on Wolf Run's failure to perform under the Agreement….

…

On May 3, 2011, [after a bench trial,] the trial court issued a Memorandum and Verdict in which it found that Wolf Run had breached the Agreement; the *force majeure* clause contained in the Agreement did not excuse Wolf Run's breach; the defense of commercial impracticability under Section 2-615 of the Uniform Commercial Code (U.C.C.) was unavailable to Wolf Run; and Allegheny Energy was entitled to damages as a result of Wolf Run's breach of contract. The trial court awarded damages to Allegheny Energy in the total amount of $104,103,893.00. [This award included past damages and prejudgment interest for breaches related to the Sycamore No. 2 Mine, and past damages, and prejudgment interest, for breaches related to the Sycamore No. 1 Mine.]

***Allegheny Energy Supply***, 53 A.3d at 56 (footnote in original). Both parties filed post-trial Motions, which the trial court denied. Upon the entry of judgment, Allegheny Energy and Wolf Run filed timely appeals.

On appeal, a panel of this Court affirmed in part, and vacated and remanded in part. ***See id.*** at 60. Of particular note, this Court affirmed the trial court's rejection of Wolf Run's *force majeure* defense, because "the conditions leading to the breach of the Agreement were not beyond the reasonable control of Wolf Run, and occurred due to Wolf Run's fault or

negligence concerning the maintenance and operation of the Sycamore No. 2 Mine." *Id.* at 62 (footnote omitted).

As to damages, this Court affirmed the trial court's calculation of past damages through 2010. *Id.* at 64. However, this Court rejected the trial court's determination that Wolf Run repudiated the Agreement as of the date of trial, and the trial court's use of that date to calculate the award of future damages. *Id.* Specifically, this Court observed that, according to the uncontroverted facts of record, Wolf Run had repudiated the Agreement as of August 2006. *Id.* at 65. Accordingly, the Superior Court panel vacated the award of future damages to Allegheny Energy, and remanded for a re-calculation of future damages using the market price of coal in August 2006.[7] *Id.* at 66.

A non-jury trial was scheduled to take place, on the issue of future damages, in May 2013. In the interim, on April 22, 2013, Allegheny Energy filed an Amended Complaint asserting two counts of breach of the Agreement, based upon Wolf Run's failure to deliver sufficient amounts of coal in 2011 and 2012. In addition, Allegheny Energy sought relief in the form of a declaration that Wolf Run could not renegotiate the price of its coal, through the application of a price re-opener provision of the Agreement. Amended Complaint, ¶¶ 34-55. Wolf Run filed a Motion for

---

[7] As we will discuss *infra*, the Court excluded from the future damages calculation the 480,000 tons that Wolf Run was obligated to deliver in 2011 and 2012.

judgment on the pleadings as to Allegheny Energy's claim for declaratory relief, to which Allegheny Energy filed a Cross-Motion for judgment on the pleadings.

On October 24, 2013, the trial court granted Allegheny Energy's Cross-Motion for judgment on the pleadings as to Allegheny Energy's claim for declaratory relief. **See** Memorandum and Order of Court, 11/19/13, at 1 (unnumbered). Wolf Run filed a Motion to certify the trial court's Order for immediate appeal, which the trial court denied. Thereafter, Wolf Run timely filed a Notice of Appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal.[8]

Wolf Run now presents the following claims for our review:

1. Do Uniform Commercial Code ["UCC"] provisions on breach of installment contracts preclude application of the common law doctrine of prior material breach to the [Agreement], when the parties continue to perform the contract?

2. Did the [trial] court err by construing a mathematical formula as a condition precedent, so as to preclude application of a pricing provision in the parties' long-term coal sales [A]greement?

Brief for Appellant at 3.

Wolf Run challenges the trial court's grant of judgment on the pleadings in the form of declaratory relief. **Id.** at 15.

---

[8] An order declaring the rights of the parties is immediately appealable pursuant to 42 Pa.C.S.A. § 7532 and Pa.R.A.P. 341(b)(2). As the trial court's Order finally declared the rights of the parties under the Agreement, the matter is properly before this Court for review. **See id.**

> Our review of the [trial court's] granting [a] motion for judgment on the pleadings is limited to whether the court committed an error of law or whether unresolved questions of material fact remained. In reviewing a grant of judgment on the pleadings[,] this Court regards all of the non-moving party's well-pleaded allegations as true, and may consider against that party only those allegations that it has admitted….

***Pennsylvania Dep't of Banking v. NCAS of Delaware, LLC***, 948 A.2d 752, 759 (Pa. 2008) (internal citations omitted).

The trial court entered judgment on the pleadings, granting Allegheny Energy declaratory relief.

> In reviewing a declaratory judgment, we are limited to determining whether the trial court committed a clear abuse of discretion or error of law. ***Vernon Township Volunteer Fire Department, Inc. v. Connor***, 579 Pa. 364, 855 A.2d 873, 879 (Pa. 2004) (citation omitted). "An appellate court may not substitute its judgment for that of the trial court if the determination of the trial court is supported by competent evidence." ***Id.*** (citation omitted).

***Vanderhoff v. Harleysville Ins. Co.***, 78 A.3d 1060, 1065-66 (Pa. 2013). As to issues of law, our standard of review is *de novo* and our scope of review is plenary. ***Generette v. Donegal Mutual Ins. Co.***, 957 A.2d 1180, 1189 (Pa. 2008).

Wolf Run first claims that the trial court erred when it applied the common law doctrine of prior material breach, so as to preclude Wolf Run from invoking the price re-opener provision set forth in Article 9 of the Agreement. Brief for Appellant at 15. Wolf Run asserts that the Agreement is a contract for the sale of goods, and, therefore, is governed by the UCC. ***Id.*** at 17. Wolf Run argues that, because the UCC "is a complete

- 7 -

codification of the law governing contracts for the sale of goods, inconsistent common law theories not incorporated therein, such as prior material breach, do not apply." *Id.* at 18. According to Wolf Run, Allegheny Energy's prior appeal and current pleadings improperly relied upon the common law doctrine of prior material breach so as to preclude Wolf Run from invoking the price re-opener provision set forth at Article 9. *Id.* at 17, 18.

Wolf Run further argues that, pursuant to UCC 2-612(3), an installment contract is automatically reinstated, after a material breach, if the non-breaching party demands performance as to future installments, or accepts ongoing performance "in the absence of seasonable notice of cancellation." *Id.* at 21. Wolf Run asserts that, even if a prior material breach had occurred, Allegheny Energy reinstated the entire Agreement, including all corresponding rights and obligations thereunder. *Id.* According to Wolf Run, because Allegheny Energy continued to demand future contract performance, all rights and obligations continued, including Wolf Run's right "to negotiate a fair contract price for future shipments of coal demanded by Allegheny [Energy]." *Id.* at 22, 23.

Wolf Run also argues that the trial court's declaratory judgment creates "an arbitrary and indefensible distinction between Wolf Run's rights under the three express pricing provisions in the [Agreement] that set and adjust the contractual Base Price, or 'contract rate.'" *Id.* at 24. Wolf Run directs our attention to Article 7 of the Agreement, which provides

- 8 -

adjustments for quality deviations, and Article 8, which allows a semi-annual adjustment to the Base Price of coal. *Id.*

Wolf Run challenges the trial court's interpretation of Section 9.1 of the Agreement.

> When interpreting the language of a contract, the intention of the parties is a paramount consideration. In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.
>
> When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.
>
> On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is obscure in meaning through indefiniteness of expression or has a double meaning. Where the language of the contract is ambiguous, the provision is to be construed against the drafter.

*Jerome Markowitz Trust v. Markowitz*, 71 A.3d 289, 301 (Pa. Super. 2013) (citation omitted). Finally, "in determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect.... [This Court] will not interpret one

provision of a contract in a manner which results in another portion being annulled." ***LJL Transp., Inc. v. Pilot Air Freight Corporation***, 962 A.2d 639, 647-48 (Pa. 2009) (citations omitted).

In relevant part, Article 9 of the Agreement provides as follows:

9.0  RE-OPENER

9.1  If [Wolf Run's] total aggregate annual cost per ton of producing Source Mine[9] coal (in an amount equal to the Annual Base Amount) during any calendar year … shall exceed … the Base Mine Price then in effect (as the same may have been adjusted in accordance with Article 8.0), then [Wolf Run] shall have the right at any time within ninety (90) days after the end of such calendar year to give Buyer written notice of its election to negotiate an adjustment to the Base Price pursuant to this Article 9.0 ….  [Wolf Run] shall furnish to [Allegheny Energy], upon request therefor, sufficient information concerning [Wolf Run's] cost of producing Source Mine coal (other than information the disclosure of which would breach any confidentiality agreement or other legal requirement by which [Allegheny Energy] may be bound) to enable [Allegheny Energy] to verify whether such condition has been met.  Subject to such limitations, [Allegheny Energy] shall have the right at its expense to examine, or cause an audit to be made of, the record books of account of [Wolf Run] with respect to its cost of production of Source Mine coal.

Agreement, Sections 9.0, 9.1 (footnote added).  In the prior action, accepting the testimony of Wolf Run's expert, the court recognized a revised Annual Base Amount of 480,000 tons of Source Mine coal, which amount was to be subtracted from the calculation of future damages on remand. ***Allegheny Energy***, 53 A.3d at 65.

---

[9] The Agreement expressly identified Wolf Run's "Harrison Division Sycamore No. 2 Mine" as "the 'Source Mine.'"  Agreement at 1.

Contrary to Wolf Run's allegation, our review discloses that the trial court did not apply the common law doctrine of prior material breach. Rather, the trial court applied the clear and unambiguous language of Section 9.1. In its November 19, 2013 Memorandum and Order, the trial court declared that "the provisions of [Article] 9 as to price renegotiation are not available to [Wolf Run]." Trial Court Memorandum and Order, 11/19/13, at 1 (unnumbered). In its August 27, 2014 Opinion, the trial court explained that since Wolf Run has "never produced the contractual [B]ase [A]mount (either 1.8 million tons per year or the revised 480,000 tons per year), they cannot exercise the re[-]opener section of the coal sales [A]greement." Trial Court Opinion, 8/27/14, at 3. Upon our review of the Agreement, we agree with the trial court's interpretation and application of Section 9.1. ***See id.***

Section 9.1 provides that the price for coal may be re-opened when Wolf Run's cost of producing "Source Mine coal" "**(in an amount equal to the Annual Base Amount) during any calendar year**" increases by a determined percentage. Agreement, Section 9.1 (emphasis added). The trial court properly gave effect to all of Section 9.1, and correctly determined that, "[s]ince [Wolf Run has] never produced the contractual Base Amount (either 1.8 million tons per year or the revised 480,000 tons per year)[, it] cannot exercise the re-opener section of the … [A]greement." Trial Court Opinion, 8/27/14, at 3.

- 11 -

Wolf Run's comparison of Section 9.1 to other sections of the Agreement is unavailing. Although Articles 7 and 8 permit price adjustments, these adjustments are subject to the limitations set forth in each section, respectively.

Article 7 permits a price adjustment based upon the quality of the Source Mine coal:

> 7.0  PRICING AND PAYMENT
>
> 7.1  [Allegheny Energy] shall pay to [Wolf Run], subject to the quality adjustments contained herein, a base purchase price per million BTU for all coal delivered hereunder (the "Base Price") at the rate of [redacted] F.O.B. the Station. If [Allegheny Energy] exercises its option to increase the Annual Base Amount pursuant to Section 1.2, then the Base Price less the transportation cost allowance set forth in Section 8.5 (as each may be adjusted in accordance with Article 8.0) (such remainder, the "Base Mine Price") applicable to all coal delivered to Buyer thereafter shall be reduced by an amount equal to [redacted] % of the Base Mine Price then in effect.

Agreement, Sections 7.0, 7.1 (emphasis added). Section 7.2 of Article 7 permits a price adjustment "[w]henever the coal delivered *during any Sample Period* does not conform" to enumerated quality specifications. Agreement, Section 7.2 (emphasis added). The term "Sample Period," defined at Section 4.3 of the Agreement, divides each calendar month into three, specific Sample Periods. Agreement, Section 4.3. Thus, although price adjustments are permitted under Article 7, they are restricted by the enumerated quality specifications, as determined during Sample Periods.

Similarly, Article 8, Section 8.0, "Base Price Escalation Adjustments," permits price adjustments based upon other factors (*i.e.*, labor, medical costs, steel supplies, *etc.*). Agreement, Sections 8.0-8.8. Article 8 imposes specific schedules for adjusting the Base Price of coal, and formulas for determining the price as of an "Adjustment Date." Agreement, Sections 8.2-8.8.

By contrast, Article 9 does not provide for a "Sample Period," as stated in Article 7; utilize an "Adjustment Date," as is provided in Article 8; or include schedules or formulas for projecting prices. Rather, Article 9 restricts its application to instances where Wolf Run's "total *aggregate annual cost* per ton of producing Source Mine coal (in an amount equal to the Annual Base Amount) *during any calendar year*" exceeds a stated amount. Agreement, Section 9.1 (emphasis added). The clear and unambiguous language requires that Wolf Run produce an amount equal to the Annual Base Amount, and that its total aggregate costs exceed the stated amount.[10]

By their Complaint underlying the instant appeal, Allegheny Energy averred that in 2011, Wolf Run delivered only 372,255 tons of coal--107,745 tons below the Annual Base Amount. Complaint, ¶¶ 18-19. Allegheny Energy further averred that Wolf Run had notified Allegheny Energy that

---

[10] This interpretation is consistent with Section 9.1's restriction that Wolf Run may exercise its rights under that Section "any time within ninety (90) days *after* the end of such calendar year[.]" ***Id.*** (emphasis added).

production from the Sycamore No. 2 Mine, during 2012, would not make up the 2011 shortfall. *Id.* at ¶ 20. In addition, Allegheny Energy asserted that in 2012, Wolf Run again failed to produce the Annual Base Amount of coal. *Id.* at ¶¶ 25-26, 28. Wolf Run does not challenge these averments. Under these circumstances, we discern no error in the trial court's interpretation of Article 9, and its declaration that Wolf Run cannot reopen the price under Article 9 of the Agreement. Accordingly, we cannot grant Wolf Run relief on its claim.

Wolf run next claims that the trial court's declaratory judgment cannot be sustained "on Allegheny [Energy's] erroneous interpretation of the [Agreement]." Brief for Appellant at 26. Wolf Run argues that the record "lacks a scintilla of evidence" that the parties intended the production of the Annual Base Amount as a condition precedent to the application of Article 9. *Id.* In support, Wolf Run baldly asserts that the requirement for it to provide "precisely 480,000 tons of coal delivered in trucks carrying 30-40 tons is absurd." *Id.* at 27. Wolf Run also argues that "to suggest that an important condition precedent was expressed by a parenthetical is perhaps only slightly less absurd." *Id.* According to Wolf Run, the Agreement's reference to an amount "equal to" the Annual Base Amount is a formula, not a condition precedent. *Id.* at 31. According to Wolf Run, the Agreement "means that[,] regardless how many tons are produced and delivered during

a calendar year, Wolf Run must calculate its cost per ton based on production of 'an amount equal to the Annual Base Amount.'" *Id.*

Contrary to Wolf Run's assertions, such an interpretation is not absurd, and is supported by the clear an unambiguous language of the Agreement. *See Markowitz*, 71 A.3d at 301. To re-open the price under Section 9.1, Wolf Run's total aggregate costs for production of coal, in an amount equal to the Annual Base Amount of coal, must exceed the stated amount. In contrast to Articles 7 and 8, Article 9 provides no adjusted dates, sample periods, or use formulas to project prices. The trial court's interpretation is supported by language in Section 9.1, which requires Wolf Run to provide Allegheny Energy with notice "within ninety (90) days after the end of the calendar year in which such increase occurs." Agreement, Section 9.1.

Accordingly, the trial court's interpretation and application of Section 9.1 is supported by the clear and unambiguous language of that Section. Because Wolf Run is not entitled to relief, we affirm the Order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/30/2015