J-A23022-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KEENAN AND SHADE LAWSON, H/W | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALBERT EINSTEIN MEDICAL CENTER | : | No. 889 EDA 2019 |

Appeal from the Judgment Entered October 3, 2018
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  3214 June Term 2016

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED DECEMBER 02, 2020**

Keenan (Lawson) and Shade Lawson, h/w (collectively, the Lawsons) appeal *nunc pro tunc* from the judgment entered on October 3, 2019, in favor of Albert Einstein Medical Center (Einstein) in the Court of Common Pleas of Philadelphia County (trial court).  Specifically, the Lawsons argue that the trial court erred in giving a misleading non-standard citizen's arrest jury instruction.

This contention is perplexing because Lawson did not plead there was false imprisonment, an illegal detention or an illegal citizen's arrest and

_____

[*] Retired Senior Judge assigned to the Superior Court.

Einstein did not plead that there was a proper citizen's arrest as a defense.[1]

Nonetheless, both the Lawsons and Einstein and the trial court focus on the

_____

[1] "The concept of citizen's arrest as it has been developed by the courts is almost exclusively used as defense or justification on the part of the arresting person. In tort law the citizen's arrest is defined as a privilege that prevents an intentional invasion of another person's interests, which otherwise would constitute assault, battery, and false imprisonment, from being tortious and, therefore, the basis for civil liability. The conditions required to establish the privilege, generally stated, are that a felony has been committed and that the actor reasonably suspects that the person whom he arrests has committed the felony. *See Mahaffey v. Byers*, 25 A. 93 (Pa. 1892); *see generally* Restatement (Second) of Torts, §§ 118, 119, 127." *Commonwealth v. Corley*, 491 A.2d 829, 833–34 (Pa. 1985).

Section 118 of the Restatement (Second) provides that "a private person is privileged to arrest another without a warrant for a criminal offense

> (a) if the other has committed the felony for which he is arrested, or
>
> (b) if an act or omission constituting a felony has been committed and the actor reasonably suspects that the other has committed such act or omission, or
>
> (c) if the other, in the presence of the actor, is committing a breach of the peace or, having so committed a breach of the peace, he is reasonably believed by the actor to be about to renew it, or
>
> (d) if the other has attempted to commit a felony in the actor's presence and the arrest is made at once or upon fresh pursuit, or
>
> (e) if the other knowingly causes the actor to believe that facts exist which would create in him a privilege to arrest under the statement in Clauses (a) to (d).

Our Supreme Court expressly declined to reach "the propriety of the Superior Court's holding that a citizen may arrest for a misdemeanor breach of the peace committed in his presence." *Commonwealth v. Corley*, 491 A.2d

propriety of a citizen's arrest, even though they differ on when the citizen's arrest occurred and for what offense he was arrested.

Nonetheless, for the reasons that follow, we affirm.

**I.**

We take the following factual background and procedural history from the trial court's April 11, 2019 opinion and our independent review of the certified record.

On June 28, 2016, the Lawsons filed a civil personal injury complaint against Einstein for assault and battery, intentional infliction of emotional distress and loss of consortium related to an incident that occurred at approximately 3:00 A.M. on the morning of July 1, 2014. The Complaint alleged Lawson picked up a husband and wife and transported the husband to the hospital because he was shot. After Einstein Security Officers secured the car and Lawson exited (First Interaction), the Complaint alleged:

> 7. Upon [Lawson's] arrival at the front entrance of the emergency room, the woman [(wife)], who was assisting the wounded man [(husband)] inside, requested that Plaintiff Keenan Lawson hold a few items while she assisted him into the hospital.

> 8. Plaintiff Keenan Lawson noticed that one of the items was a bag which appeared to contain a small amount of marijuana and he indicated to the woman that "she couldn't take that into the hospital with her."

_____

829, 834 (Pa. 1985). We note that **Corley** was a suppression case and a citizen's arrest was not being used as a defense to a civil claim.

9. While Plaintiff Keenan Lawson was holding the items, an Albert Einstein security guard stated that "you better get rid of that before the police arrive."

10. Plaintiff Keenan Lawson walked a few steps to throw the bag into a nearby trash can when suddenly and without warning, he was attacked by about five (5) Albert Einstein security guards, one of whom stated "oh, so now you are trying to run.

11. At that juncture, Plaintiff Keenan Lawson, in the presence of his wife, Shade Lawson, was handcuffed by these security guards and then brutally beaten despite the fact that Plaintiff Keenan Lawson offered no resistance whatsoever [(Second Interaction)].

(Complaint, 6/28/16, at 2) (pagination provided).

Einstein filed an Answer with New Matter on September 7, 2016, in which it stated, in relevant part, that it did not "wrongfully, maliciously, intentionally, or without cause illegally or wantonly assault [Lawson]." (Answer with New Matter, 9/07/16, at Paragraph 34). It did not raise a citizen's arrest defense. At trial, the following pertinent facts were adduced.

**A.**

**1.**

Lawson testified that at approximately 3:00 A.M. on the morning of July 1, 2014, he woke up hungry and went to a local Chinese restaurant where a woman, Monique Taylor, asked him if he would give her a ride home. (*See* N.T. Trial, 3/29/18 (Volume 1), at 69-70). As the two drove on Germantown Pike in Philadelphia, a man bleeding from a gunshot wound and his wife flagged down Lawson because they had just been robbed and needed a ride to the emergency room. (*See id.* at 70-71). The two individuals got in the

back seat of Lawson's vehicle and he took them to Einstein. (*See id.* at 72-73). The gunshot victim went into the hospital and his wife stayed behind to give Lawson some marijuana in her possession so she would not be caught with it in the hospital. (*See id.* at 73-74). He testified that without providing him any reason, the Einstein security guards immediately told him to give them the keys to his car and that he and Taylor had to vacate the vehicle. (*See id.* at 74-76). Lawson immediately got out of the car, gave the security guards his keys and walked away to call his mother. (*See id.* at 74, 76). While on the phone, several security guards rushed him, threw him to the ground, punched and kicked him and started searching his pockets. (*See id.* at 76-77). Lawson testified that he immediately told the officers he was licensed to carry a firearm. (*See id.* at 77).

**2.**

Einstein Security Officer Wesley Applegate testified to slightly different facts. During his testimony, he explained to the jury what was occurring on an Einstein security tape of the incident and his motivations for the actions shown on that video. The officer testified that when Lawson pulled up in his vehicle, he approached to ask what was going on and to see if there was any blood or bullet holes inside of it because it could be a crime scene (First Interaction). (*See* N.T. Trial, 4/03/18 (Volume 3), at 149, 152-154). The security guards do not carry guns or wear bulletproof vests. (*See id.* at 155). The officer saw blood "all over the back seat." (*Id.* at 152). He did not see

- 5 -

any weapons and neither Lawson nor Ms. Taylor told him that they possessed either a gun or marijuana. (*See id.* at 152, 158). He testified that out of the corner of his eye, he might have seen the gunshot victim's companion hand something to Lawson, but he was not sure. (*See id.* at 155-56). When Lawson got out of the vehicle so that the security guards could tape off the area as a crime scene, Lawson was cursing and upset. (*See id.* at 155, 158). Officer Applegate, who was trained to de-escalate such situations, explained to the visibly upset Lawson that the police were on their way and would want to talk to him, but that he was not in trouble. (*See id.* at 154-58). The officer stated that he did not know at what point Lawson decided that he would stay. (*See id.* at 155).

As Lawson began to walk away from the officer, a verbally aggressive Ms. Taylor approached, "yelling and cursing at [him]." (*Id.* at 159, 162). The videotape showed that Lawson had walked to an adjacent parking lot for patients and visitors to the emergency room and labor and delivery. (*See id.* at 159-60). At the time of the incident, Officer Applegate was focused on de-escalating the situation with Ms. Taylor and did not see where Lawson walked off to when the guard "heard someone say, 'He has a gun, he has a gun.'" (*Id.* at 162; *see id.* at 159). The officer's immediate concern was for the safety of patients, visitors, himself and his fellow officers. (*See id.* at 163-65).

Upon hearing "he has a gun," Officer Applegate and approximately four or five other security officers ran to the area. (*See id.* at 166, 172). "[They] perceived that [Mr. Lawson] had tripped and fell and then one of [the] officers jumped on top of him because they see his hand keep going to his waistband." (*Id.*). The responding officers did not beat, kick or punch Lawson or tear at his clothes. (*See id.* at 171). Officer Applegate explained that two officers could be seen on the videotape trying to grab Lawson's arms out from under him because he could be reaching for the gun to shoot others or it could go off and harm him, and it was the officers' responsibility to protect everyone on Einstein property, including Lawson. (*See id.* at 172-73). He testified that in his experience, when he sees someone reaching into his waistband, it has been for a weapon. (*See id.* at 167).

The officer agreed with counsel that prior to the gun incident, the videotape showed at least four minutes of him trying to de-escalate the situation before Mr. Lawson walked away. (*See id.* At 166-67). When asked if there "would [have] been anything preventing [Lawson,] if he had not shown that he was going for his gun[,] from just walking down that driveway and walking on out of there[,]" the officer responded, "No, ma'am." (*Id.* at 167).

**3.**

Corporal Raymond Sutton, Einstein Security Supervisor, also testified about what was occurring on the security videotape and his involvement in the incident. He testified that after Officer Applegate called in a gunshot

victim, Corporal Sutton and other security guards came outside. (*See id.* at 206). As he approached, the corporal observed Officer Applegate speaking with an agitated Lawson who had slammed the car door after Officer Applegate opened it upon seeing blood in the backseat. (*See id.* at 208, 213). Upon walking up to the scene, Corporal Sutton went to the passenger side of the car where Ms. Taylor was. (*See id.* at 208). When asked to identify what the gunshot victim's companion handed Lawson, the corporal said he did not know what it was. (*See id.* at 212). He could see Officer Applegate still telling Lawson to calm down because he was so agitated. (*See id.* at 209). Corporal Sutton said the first method of dealing with a situation is de-escalation. (*See id.* at 210). He said such anger and agitation was concerning in this situation because of whom Lawson brought in. He said that "[n]ever once did we look at [] Lawson as the perpetrator." (*Id.* at 214). "Only thing we know is there is a bleeding man on the inside with a gunshot who was not telling us anything." (*Id.* at 215-16). The security guards stood around Lawson's car because it had blood evidence and the gunshot victim was dropped off after riding in it, and their only purpose was to put cones and caution tape around the vehicle to "make that area sterile" for the Philadelphia Police. (*Id.* at 217); (*see* N.T. Trial, 2/04/18 (Volume 4), at 15-16). He testified that the security guards did not pose a threat to Lawson and that "[h]e was able to walk away from his car. He was able to have whatever dialogue he had with

Ms. Taylor. He was not apprehended where he was restricted. He was allowed to walk." (N.T. Trial, 4/03/18 (Volume 3), at 216-17).

Corporal Sutton testified that as Officer Applegate was talking with Lawson, Ms. Taylor walked up behind him and the officer started focusing on her. (*See* N.T. Trial, 4/04/18 (Volume 4), at 16). While Officer Applegate was talking with Ms. Taylor, Lawson walked unhindered toward the parking lot with no restraint and, because Corporal Sutton had moved the security vehicle, the corporal could see Lawson reaching for his waistband as he reached a grassy area. (*See id.* at 16-17, 19). Corporal Sutton testified that if he had just kept walking and had not reached into his pants, he could have just kept going. (*See id.* at 19-20). Instead, Lawson reached into his waistband and upon seeing this, Corporal Sutton yelled, "He has a gun, he has a gun." (*Id.*). He testified that he did this to alert his fellow officers because, although none of them were armed, they still were responsible for what occurred on Einstein property. (*See id.* at 17-18).

At that point, Corporal Sutton jumped out of his vehicle, met Security Officer Branham and the two men approached Lawson to speak with him. (*See id.* at 23). Lawson started trying to run from the security guards, saying "I ain't do nothing, I ain't do nothing," and "next thing you know he was on the ground and he fell flat forward covering his mid side[,]" having tripped over the curb. (*Id.* at 25; *see id.* at 23-24). The two officers got on either side of Lawson on the ground at the top of his shoulders and tried to pull

Lawson's arms from around him as he was trying to get up to prevent him from reaching for his weapon. (*See id.* at 27). Corporal Sutton testified that no officer threw Lawson to the ground, tried to punch or kick him or kneed him in the back. (*See id.* at 28, 31-32, 44). He said there was no video of officers punching Lawson because it did not happen. (*See id.* at 32). All of this occurred on the grass. (*See id.* at 32). At no point did Lawson tell the officers that he had a firearm in his possession. (*See id.* at 29).

After the incident, Corporal Sutton and Security Officer Branham placed Lawson in the Einstein Security vehicle, a jeep. (*See id.* at 33-34). The officers stayed on both sides of the jeep because Lawson continued trying to squirm and move, laying down across the backseat. (*See id.* at 34). Neither officer punched him while he was inside the jeep, and Corporal Sutton reached in and was able to secure the weapon from the squirming Lawson. (*See id.* at 35-38). There was no indication that Lawson was injured, gasping for air or losing his breath at any time. (*See id.* at 39-41). Corporal Sutton testified that his only intent that night was to protect everyone on the Einstein campus and prevent a potential shooting. (*See id.* at 46-47). Corporal Sutton testified that Einstein Security did not arrest Lawson and merely held him after the gun incident until the Philadelphia Police arrived pursuant to Einstein policy. (*See id.* at 43-44).

**4.**

The Lawsons presented Attorney Samuel Stretton as a legal expert. He testified that, theoretically, if a security guard tells an individual he is not free to leave, that person would be arrested. (**See** N.T. Trial, 4/03/18 (Volume 3), at 22-23). Furthermore, although initially testifying that a felony must be committed in an arrestor's presence to justify a citizen's arrest, he conceded that pursuant to **Corley**, the only case he relied on in his expert report, a citizen could make an arrest for a felony or misdemeanor breach of the peace. (**See id.** at 39, 65).

Einstein provided the testimony of William Birks, who testified as a security expert. Mr. Birks testified that after reviewing the videotape, it was his expert opinion, within a reasonable degree of professional certainty, that the security guards complied with Einstein's policy and did a good job. (**See** N.T. Trial, 4/04/18 (Volume 4), at 124-25). He agreed that the video evidence was as the guards described it at trial. (**See id.** at 131, 143).

**B.**

At the conclusion of testimony, the court charged the jury, in pertinent part, on justification-defense of others as follows:

> The defendant has raised the issue of whether its security guards acted in defense of another when they restrained the plaintiff. So this defense is called justification in the law of Pennsylvania. If the defendant's actions were justified, you cannot find them liable for the intentional torts of assault and battery. The defendant has the burden to prove that the security guards actually believed that another was in danger of becoming the victim of unlawful force such that the defendant's employees

needed to use force to defend the other person or persons at the moment the guards used it and that the guards belief that they needed to use such force was reasonable in light of all the circumstances known to them.

Keep this in mind. A person is justified in using force against someone not only when he or she believes another is in actual danger of unlawful attack, but also when the defendant mistakenly but reasonably believes they are. A person is entitled to estimate the necessity for the use of force he or she employs under the circumstances as he or she reasonably believes them to be at the time. In the heat of a conflict a person who sees another attacked ordinarily has neither time nor composure to evaluate carefully the danger and make nice judgments about exactly how much force is needed to protect the other person.

Consider the realities of the situation faced by … defendant here when you assess whether it has proven that its employees believed another was actually in danger of unlawful force to the extent that they needed to use such force in their defense, and that their belief was reasonable.

Unlawful force means any form of force that is employed without the consent of the person against whom it is directed where its use would constitute an offense or actionable tort.

If you find that the Albert Einstein Medical Center's personnel were justified in their actions, plaintiffs cannot recover any damages.

(N.T. Trial, 4/05/16 (Volume 5), at 177-79).

It then went on to charge on what was a lawful citizen's arrest:

Under Pennsylvania law a private person who makes a lawful arrest is justified in using any force which he or she believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest.

And also under Pennsylvania law a layperson, that is someone who is not a police officer, may arrest another person only if he or she believes the person being arrested committed a felony or breach of the peace, and that the felony or breach of the

- 12 -

peace was committed in the presence of that person making the arrest.

An arrest is the taking of another person into custody under an assertion of legal authority to do so and for the purpose of bringing that person before a court or otherwise securing the administration of law. An arrest may be accomplished by any act that indicates an intention to take that person into custody and that subjects the person to control of another. An arrest is improper where it's made without probable cause.

Probable cause means that the person making the arrest believed at the time of the arrest, and a reasonable person under the same circumstances would have also believed, that he or she had sufficient information of both the facts and the applicable law to reasonably believe that a crime had been or was being committed and that the person arrested was guilty of committing the crime.

If you find that Albert Einstein Medical Center's personnel had probable cause to arrest the plaintiff, the plaintiffs cannot recover damages.

(***Id.*** at 179-81).

On April 5, 2018, the jury began its deliberations and was provided with a Verdict Sheet, which requested the jury answer "yes" or "no" to the following pertinent interrogatories:

**QUESTION 1:**

Do you find that Defendant, Albert Einstein Medical Center, committed assault against Plaintiff Keenan Lawson?

**QUESTION 2:**

Do you find that Defendant, Albert Einstein Medical Center, committed battery against Plaintiff Keenan Lawson?

- 13 -

**QUESTION 3:**

Do you find that Defendant Albert Einstein Medical Center['s] actions were justified as the defense of others?

If you Question 3 "Yes," Plaintiff cannot recover and you should not answer any further questions. Tell the court crier that you have reached a verdict.

(Verdict Sheet, at 1-2). The Verdict Sheet did not ask the jury to decide if a citizen's arrest had occurred. (**See id.**).

On April 6, 2018, the jury returned a verdict in favor of Einstein, finding that Einstein security guards did not commit an assault on Lawson during the Second Interaction and that, although it committed a battery, it was justifiable in the defense of others. (**See id.**).

The Lawsons filed a timely post-sentence motion for a new trial on the basis that they were prejudiced by the erroneous non-standard jury instruction on a citizen's arrest that relied on the language of **Corley**, **supra**. (**See** Plaintiffs' Motion for Post-Trial Relief (Motion for a New Trial), 4/11/18). They maintained that the citizen's arrest instruction, as stated to the jury, incorrectly used the word "crime" instead of "breach of the peace," which would allow anyone to arrest for any perceived crime, and included marijuana when it should not have been that broad. They also argued that **Corley** contradicted other Pennsylvania law. (**See id.** at Paragraph 7(g) and (h), and Paragraph 10). The trial court denied the motion on May 30, 2018. On October 3, 2018, the Lawsons filed a *praecipe* to enter judgment. They filed

- 14 -

a timely appeal *nunc pro tunc* on February 19, 2019.[2]  Both they and the trial court complied with Rule 1925.  **See** Pa.R.A.P. 1925.

## II.

### A.

On appeal, the Lawsons contend that the trial court committed reversible error when it gave a non-standard jury instruction to the jury regarding when a "citizen's arrest" was legal.  They assert that by informing them that a citizen's arrest could be made for a felony or breach of the peace committed in that person's presence, "but then failing to explain the definition of what constituted a 'breach of the peace,' the jury was erroneously misled into believing that possession of marijuana[3] could have constituted breach

---

[2] The Lawsons filed an appeal of the trial court's order denying their post-trial motion that ultimately was quashed on September 7, 2018, because judgment had not been entered.  After filing their *praecipe* to enter judgment on October 3, 2018, the Lawsons filed a Petition to Appeal *Nunc Pro Tunc* in this Court on October 9, 2018, which was unnecessary since it was filed within the 30-day appeal period.  This Court denied the motion on November 9, 2018, beyond the 30-day appeal period without prejudice to the Lawsons seeking the relief in the trial court.  On November 19, 2018, the Lawsons filed a Petition to Appeal *Nunc Pro Tunc* that the trial court granted on February 11, 2019, finding the delay in filing an appeal was due to a breakdown in the court's operations and non-negligent happenstance.

[3] The Lawsons claim the charge was in error because it "include[d] marijuana when it should not have been that broad," since marijuana possession is not a breach of the peace justifying a citizen's arrest.  (The Lawsons' Brief, at 11) (emphasis omitted); (**see id.** at 15).

However, the Lawsons' argument is belied by the record because marijuana possession is not mentioned in the instruction provided to the jury.  Although

of the peace, which absolutely runs contrary to the law of this Commonwealth." (The Lawsons' Brief, at 4) (emphases omitted).

The Lawsons maintain that an illegal citizen's arrest occurred during the First Interaction, *i.e.*, when Einstein security guards asked Lawson to get out of his car and secured it until the police arrived. (***See id.*** at 5, 9, 11).[4] They argued that if the original detention was illegal, as testified by the Lawsons' legal expert witness, the events subsequent to that, including the battery and

_____

a reference to marijuana possession was in a draft version of the jury instruction, it was removed from the final version, following the Lawsons' objection. (***See*** N.T. Trial, 4/05/18, at 39); (***see also*** Trial Ct. Op., 4/11/19, at 7). Therefore, any challenge to the jury instruction based on the inclusion of marijuana possession as a breach of the peace is simply not supported by even a cursory reading of the record.

[4] The Lawsons assume that based on the instruction, the jury thought a legal citizen's arrest had occurred during the First Interaction. Not only is the Lawsons' assumption speculative, it is just as possible that the jury did not think there was a citizen's arrest. The record reflects that Lawson testified that upon arriving at Einstein and dropping off the gunshot victim, he immediately was asked for his keys and to exit the vehicle, which he did, walking away to make a phone call. Einstein presented testimony that, although the Lawsons' car was seized in order to preserve a crime scene due to the presence of blood and the fact that he had just dropped off a gunshot victim, he was not a suspect in the shooting and was free to leave. The officers did not testify that they were arresting him for possession of marijuana or anything else since, at the time of the First Interaction, they did not even know he possessed them. The jury was free to believe all, some or none of this testimony and find that Lawson was not under arrest. ***See Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.***, 53 A.3d 53, 64 (Pa. Super. 2012), *appeal denied*, 69 A.3d 599 (Pa. 2013) (affirming because "fact finder, was free to believe all, part of none of the evidence presented[.]").

any perceived "justification" for the battery, would not have otherwise occurred but for the illegal detention.

In response, Einstein contends that a valid citizen's arrest occurred during the Second Interaction when the guards jumped on Lawson when he went into his waistband to reach for a firearm. Einstein contends that the jury charge was proper as accurately reflecting the law of the Commonwealth and, even if it was not proper, it was harmless error.

We disagree with the Lawsons for the following reasons.

**B.**

Addressing those positions is difficult because they do not really address what was necessary for the jury to find no liability on Einstein's part. As stated previously, a citizen's arrest was introduced, not as a claim or defense, but as an expert opinion that an illegal arrest occurred during the First Interaction for which no claim was made. Einstein's position that there was a valid citizen's arrest during the Second Interaction, where the purported injuries occurred, was not raised as a defense to that interaction. It is not surprising, then, that since no damages are claimed as a result of the First Interaction (where the Lawsons claim the purported illegal citizen's arrest occurred), and Einstein did not raise citizen's arrest as a defense to the Second Interaction, that the Lawsons' argument that the charge of citizen's arrest, *i.e.*, false imprisonment or unlawful detention, is irrelevant as to whether they made out their case that there was an unlawful assault by Einstein security guards in

the Second Interaction. Moreover, even if a citizen's arrest is not totally irrelevant, the Lawsons have failed to make out their claim for the following reasons.

First, even if properly pled, the only relevance of a citizen's arrest would have been if there were a claim of false imprisonment or illegal detention to which a citizen's arrest would have been a valid defense. The Lawsons brought no such claims – only that Lawson was illegally assaulted. In answering that question, the jury found that although Einstein security guards committed a battery on Lawson, they were acting in justified defense of others when they did so and, therefore, Einstein was not liable. Once that determination was made, whether there was a citizen's arrest was irrelevant, even if it had been pled as a defense to a claim of false imprisonment or illegal detention. In fact, the jury interrogatories asked **nothing** about a citizen's arrest. The jury made **no finding** about a citizen's arrest.

Second, the Lawsons' argument that "but for" the purported illegal citizen's arrest that they contend occurred during the First Interaction - when he was asked him to get out of the car, he would not have been assaulted in the Second Interaction, is nonsensical. It is the same as saying that if he had not picked up the couple and gone to the hospital, he would not have been assaulted. In other words, even assuming asking him to get out his car and securing the vehicle was illegal, there is no legal cause and effect that the First Interaction resulted in the Second Interaction in which he was assaulted.

Third, even if a citizen's arrest is somehow relevant, it was not made out during the First Interaction. For there to be a citizen's arrest, there has to be an arrest – someone has to be taken into custody. Only when a person is taken into custody do we then go on to determine whether the conduct involved was a felony or breach of the peace. In this case, the testimony supported that Lawson was never taken into custody. Corporal Sutton stated that Lawson walked unhindered toward the parking lot with no restraint, and that if he had just kept walking and had not reached into his pants where there was a gun, he could have just kept going. In other words, they never made a citizen's arrest because they never intended or took him into custody during the First Interaction. It was the Second Interaction that the jury found constituted justifiable battery on the part of the Einstein Security guards.

Fourth, even if there was any evidence that Lawson was taken into custody, the Lawsons' argument that the trial court's failure to "define[] what constituted a breach of the peace" was reversible error that was "compounded by the probable cause charge which, together, could have truly confused the jury[,]" lacks merit. (The Lawsons' Brief, at 17).[5] They provide no evidence

_____

[5] Even if this argument were not irrelevant, it would be waived for the Lawsons' failure to provide any law to support this claim to identify where in the record they preserved this issue in the trial court and for not raising it in their post-trial motion. (**See** the Lawsons' Brief, at 17); **see also** Pa.R.A.P. 302(a); Pa.R.A.P. 2119(a)-(b), (e); **Board of Supervisors of Williston Township v. Main Line Gardens, Inc.**, 155 A.3d 39, 44 (Pa. 2017) ("If an issue has not been raised in a post-trial motion, it is waived for appeal

that the trial court's failure to define breach of the peace confused the jury, or that the probable cause instruction caused them to be perplexed about a citizen's arrest in any way. In fact, the record reflects that the jury asked three questions about the jury charge, so they knew to ask questions if they did not understand, and none of their questions involved breach of the peace. (*See* N.T. Trial, 4/05/18, at 193 (jury question asking for definition of assault); N.T. Trial, 4/06/18, at 3 (jury questions regarding how intent is defined for assault and battery); N.T. Trial, 4/06/18, at 14-15 (jury question requesting written copy of the assault and battery intent definitions)).

Moreover, contrary to the Lawsons' argument, when reading the two instructions together, the "crime" referred to in the probable cause instruction logically was the "felony or breach of the peace" identified in the immediately preceding citizen's arrest charge. The Lawsons did not establish that the charge as a whole was inadequate, unclear, misleading or confusing to justify a new trial merely because the trial court did not include a specific definition for breach of peace or because the instruction, when read with the probable cause charge, was allegedly confusing. *See Smith v. Morrison*, 47 A.3d 131,

---

purposes.") (citation omitted); *see also Newman Dev. Group of Pottstown, LLC v. Genuardi's Family Market, Inc.*, 98 A.3d 645, 648 n.16 (Pa. Super. 2014), *appeal denied*, 117 A.3d 1281 (Pa. 2015) ("A new argument cannot be raised in support of an issue on appeal if it was not first presented before the trial court.") (citation omitted).

134-35 (Pa. Super. 2012), appeal denied, 57 A.3d 71 (Pa. 2012) (citation omitted).

Finally, even if the citizen's arrest charge was somehow relevant, misleading or erroneous (which we find it was not), it would be harmless error. (N.T. Trial, 4/04/18, at 179-81); *see Commonwealth v. Allshouse*, 36 A.3d 163, 182 (Pa. 2012), *cert. denied*, 569 U.S. 972 (2013). In fact, whether the instruction could have resulted in the jury panel finding that a citizen's arrest occurred and, thus, affected its justified battery verdict, is merely a hypothetical question that we are precluded from reviewing where the jury did not actually make such a finding. *See Crystal Lake Camps v. Alford*, 923 A.2d 482, 489 (Pa. Super. 2007) ("A court should not render advisory decisions on hypothetical facts.").

Accordingly, for all these reasons, even if properly before this Court, the Lawsons' arguments regarding the citizen's arrest jury instruction would lack merit. *See Morrison*, *supra* at 134-35. The Lawsons are due no relief.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/2/20

- 21 -